Scott M. Riemer (ct 28517)
RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 1750
New York, New York 10165
(212)297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
OF CONNECTICUT
--------------------------------------------------------X

PATRICIA HUGHES                                    17 CV <u>1561</u>

                              Plaintiff,           **COMPLAINT**

        -against-                                  ECF CASE

THE HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY

                              Defendant.
--------------------------------------------------------X

        COMES NOW Plaintiff, Patricia Hughes ("Ms. Hughes"), and files this

Complaint against Defendant Hartford Life and Accident Insurance Company

("Hartford"), showing the Court as follows:

## JURISDICTION AND PARTIES

        1.      Plaintiff files this action pursuant to the Employee Retirement Income

Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1001 et seq., to recover

Long Term Disability ("LTD") benefits due to her under the terms of an employee

welfare benefit plan (hereafter "The LTD Plan") maintained by Children's

Healthcare of Atlanta; seeking to clarify and/or enforce Plaintiff's rights under the Plan; or, in the alternative, seeking remand to the administrator for a prompt claim decision in compliance with the United States Department of Labor ERISA claim regulations and ERISA's guarantee of "full and fair review."

2.      The LTD Plan is an "Employee Welfare Benefit Plan" as defined by ERISA, 29 U.S.C. § 1002(1).

3.      Jurisdiction is based on ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

4.      Venue is proper in the United States District Court for District of Connecticut pursuant to 29 U.S.C. § 1132(e)(2) because Hartford's conducts business in Connecticut and it principal place of business is located within the District.

5.      Hartford is a Connecticut corporation.

6.      Patricia Hughes was a "participant" in the LTD Plan, as defined by ERISA, 29 U.S.C. § 1002(7).

7.      The LTD Plan is insured by group policy of insurance GLT-395146 issued by Defendant Hartford.

8.      Hartford has acted as *de facto* plan administrator as to the instant claim for LTD benefits, making all decisions concerning claims for benefits, and

handling all communications concerning Plaintiff's claim.

9.      All benefits under the LTD Plan are paid from the general assets of

Defendant Hartford.

## RELEVANT POLICY PROVISIONS

10.      The allegations of paragraphs 1 through 9 are hereby realleged as if

set forth herein verbatim.

11.      A copy of the LTD Policy is attached hereto as Exhibit A and is

incorporated herein by reference.

12.      Under the LTD Plan, Harford promised to pay "Disability Benefits",

as follows:

> *We will pay you a Monthly Benefit if You:*
> *1) become Disabled while insured under The Policy;*
> *2) are Disabled throughout the Elimination Period;*
> *3) remain Disabled beyond the Elimination Period; and*
> *4) submit Proof of Loss to us.*

13.      The Policy further states:

> *Disability or Disabled means You are prevented from performing one*
> *or more of the Essential Duties of:*
> *1)      Your Occupation during the Elimination Period;*
> *2)      Your Occupation, for the 24 month(s) following the*
> *        Elimination Period, and as a result Your Current*
> *        Monthly Earnings are less than 80% of Your Indexed*
> *        Pre-disability Earnings, and;*
> *3)      after that, Any Occupation.*

14.    The Policy further states:

*Any Occupation means any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:*
> 1)    *the product of Your Indexed Pre-disability Earnings and the Benefit Percentage, or;*
> 2)    *the Maximum Monthly Benefit.*

## BRIEF SUMMARY OF CLAIM

15.    The allegations of paragraphs 1 through 14 are hereby realleged as if set forth herein verbatim.

16.    This is a dispute over Hartford's termination of Plaintiff's LTD benefits.  Having accepted that the Plaintiff was "Disabled" under the Policy's "Any Occupation" definition, Hartford unilaterally reversed its position in the absence of any evidence of improvement in her condition.

17.    Ms. Hughes suffers from a serious, debilitating vestibular problem which has been objectively verified by medical tests and by longstanding clinical observations.  In 2012, her vestibular symptoms were severely exacerbated by a medical attempt to use Gentamycin drops to destroy the malfunctioning left side of her vestibular system. The procedure backfired, causing her symptoms to worsen drastically. Now she suffers unpredictable bouts of serious imbalance, spinning vertigo, crippling migraine headaches, nausea and dry heaves.

18.     These symptoms are easily provoked by bright lights, motion, reading or use of a computer, among other things. Oftentimes the symptoms occur without provocation.

19.     Although Ms. Hughes is encouraged by her treaters to engage in light activity when her symptoms are inactive, all agree that her condition leaves her *totally incapacitated* unpredictably, often for hours or days at a time.  As a result, she is unemployable.

## DETAILED HISTORY OF CLAIM

20.     The allegations of paragraphs 1 through 19 are hereby realleged as if set forth herein verbatim.

21.     Prior to becoming disabled, Ms. Hughes was employed as a Pediatric Intensive Care Data Specialist with Children's Healthcare of Atlanta.

22.     In early 2011, Ms. Hughes began having intermittent episodes of vertigo, especially when driving.  She experienced episodes of vertigo at least five times a week, lasting anywhere from two to ten minutes each.  After each vertigo episode passed, she became overcome with nausea.  She continued to experience these symptoms several times per day, as well as accompanying fatigue, headache, and depression. At times she experienced vertigo immediately upon waking in the morning.

23.    These symptoms were unpredictable and totally incapacitating, but Ms. Hughes attempted to persevere at work even after the symptoms arose.

24.    A 2011 brain MRI revealed two old strokes and possible lacunar infarcts.

25.    In August of 2012, otolaryngologist Karen Hoffmann, M.D., noted that Ms. Hughes had been "incapacitated" by horrible vertigo for over four days. During this time, she was walking into walls and experiencing extreme disequilibrium.  Ms. Hughes was unable to drive, walk, or work, and was severely nauseated.

26.    Vestibular therapist Dr. Gaye Cronin began treating Ms. Hughes in September of 2012.   During this treatment, Ms. Hughes reported a long history of Meniere's disease, and complained of imbalance, dizziness, nausea, and vertigo.

27.    Objective testing including electronystagmogram (or ENG), videonystagmogram (VNG), and posturography, among other tests, all confirmed vestibular dysfunction including both positional and provoked vertigo resulting in severe functional impairments.

28.    Ms. Hughes also began treating with Atlanta Neurology in 2012, where she underwent nerve blocks and received Botox injections for her excruciating headaches. All other conservative treatment had failed, and Ms.

Hughes continued to suffer with vertigo, headaches, nausea, and disequilibrium.

29.    Ms. Hughes' symptoms prevented her from working, and she became disabled in August of 2012.

30.    Hartford began paying LTD benefits on November 26, 2012, under the Policy's "Your Occupation" definition of Disabled.

31.    Ms. Hughes' employer could no longer accommodate her condition, and, as noted by Susan Peterson on March 29, 2013, "due to limited functionality, employee would have difficulty at this time for a job search – she does not have at least three (3) hours a day of functionality."

32.    After becoming disabled in 2012, Ms. Hughes continued to suffer with these same symptoms.

33.    Several medical providers confirmed their own observations that Ms. Hughes could not walk straight and would run into stationary objects such as walls and furniture.

34.    The vertigo was completely debilitating and, when active, made it impossible for Ms. Hughes to function in any productive capacity.

35.    In February of 2013, despite ongoing symptoms, Ms. Hughes attempted a very limited return to work.  She intended to work from home for two hours a day, with most of the work on a computer.  It became clear that using a

computer monitor would consistently provoke her symptoms. Even this modest level of activity caused her severe headaches and vertigo to increase dramatically in frequency and severity.

36.    After three weeks of trying to work two hours per day from home, she was waking with headaches so severe that she was reduced to tears and totally unable to function.  She could not even start her work, much less complete it.

37.    Despite Ms. Hughes' motivation and determination, the return to work experiment failed because even two hours of work activity per day was enough to exacerbate her condition to an intolerable state.

38.    At all times since stopping work, Ms. Hughes' vertigo and disequilibrium has unpredictably but regularly caused her to be unsteady on her feet, and she has experienced numerous falls over the last few years.

39.    In 2014, Ms. Hughes' vertigo onset while she was driving and, unfortunately, caused her to slam into the rear of another vehicle.  Consequently, she had to stop driving. She sold her vehicle and has not driven since.

40.    Ms. Hughes regularly experiences severe vertigo symptoms that are totally incapacitating.  Her symptoms are severe enough that she experiences a sensation of the room spinning, which causes nausea and dry heaves.

41.    On September 20, 2014, Hartford adjuster Susan Peterson noted in her

summary detail report that Ms. Hughes' "[o]verall disabling condition continues to be her vertigo.  Vertigo triggered by any type of movement, noise, bright lights, and reading. Vision starts bouncing.  Does not drive at all and avoids social gatherings because of the visual stimuli and noise."

42.    On November 26, 2014, the definition of Disabled changed under the Policy from "Your Occupation" to "Any Occupation."

43.    In her November 26, 2014, summary detail report Hartford examiner, Linda Spinler, noted that Ms. Hughes treated "with transcranial labytinthotomy on 06-26-2012 due to dizziness/vertigo, and continued to work until August 27, 2012, when symptoms worsened.  She returned to work part-time from home February 4, 2013, to March 19, 2013, but increased vertigo and daily headaches/migraines, was unable to continue."

44.    In the context of its "Any Occupation" investigation, Hartford performed surveillance on Ms. Hughes on December 4, 2014. Ms. Hughes was observed for 3 minutes and 42 seconds, during which time she sat on her porch with coffee and walked off her porch to hand something to the trash collectors. Hartford continued LTD benefits thereafter.

45.    Based on the totality of the evidence including this surveillance, Hartford agreed Ms. Hughes remained disabled under the Any Occupation

definition.  LTD benefits were continued.

46.    In her September 22, 2015, Attending Physician Statement, Dr. Gaye Cronin stated that Ms. Hughes' expected duration of symptoms was "indefinite" due to the severity and chronic nature of her vertigo and imbalance.  Dr. Cronin further stated Ms. Hughes "remains totally disabled."

47.    On April 7, 2016, Cassandra Jung of Hartford decided the claim needed aggressive re-investigation simply because, in her non-medical-expert view, "Restrictions and limitations appear overstated based on claim findings. A September 29, 2015, Physicians Statement noted Ms. Hughes can sit for 20 minutes at a time, walk 10 minutes a time, stand 5 minutes at a time, and cannot drive.  However, claimant stated in a June 18, 2015, phone call that she was visiting family in Indiana, and would be back in Georgia later that month.  She also stated her flight to get there was almost 80 minutes and she attended her mom's 80th birthday party, a family reunion, and a baby shower. Referred to surveillance."

48.    Therefore, Hartford in fact did begin to aggressively "investigate" the claim, simply because Ms. Hughes had the audacity to attempt an out of state trip to visit her family.

49.    The first action taken by Hartford to "investigate" the claim was another round of surveillance. On April 15, 2016, about 9 hours of surveillance was performed.

50.    The only activity observed during the entire 9-hour surveillance period was Ms. Hughes simply walking her dog slowly through her neighborhood for 16 minutes.  8 hours and 42 minutes of the surveillance revealed no activity at all outside the home.

51.    On April 26, 2016, Hartford once again arranged surreptitious surveillance during which Ms. Hughes was confined to her home for 6 and one half hours.

52.    The only activity observed was when Ms. Hughes again walked her dog for about 24 minutes, and performed light weeding in her garden *with assistance from a friend* on and off for about two hours.

53.    Placed in proper context, the surveillance revealed nothing whatsoever new or contradictory about the claim.  Ms. Hughes has consistently admitted, and her doctors have confirmed, that *when her symptoms are inactive* she can walk her dog at a slow pace, pull weeds, or do other light activities that do not involve bright (especially fluorescent) lights, motion around her, reading, or using a computer. Her doctors encourage her to do so.

54.    The second round of surveillance was not materially different than what Hartford obtained in the first round of surveillance in December, 2014, *after which it determined Ms. Hughes was totally disabled from Any Occupation*.

55.    Hartford has repeatedly been chastised by federal courts for taking surveillance evidence completely out of context, and yet it continues to do in this claim and others.

56.    The surveillance here is meaningless information and is irrelevant in evaluating Ms. Hughes' disability claim.

57.    In addition to surveillance, in May of 2016, Hartford insisted that Ms. Hughes undergo an in-person interview at her home.

58.    In this interview Ms. Hughes was asked if she traveled to Indiana. Ms. Hughes was forthright.   She confirmed she had traveled to Indiana with an escort, and with medically supervised travel precautions.   These precautions included, according to Ms. Hughes' vestibular therapist, increasing anti-nausea and/or anti-vertigo medications, avoiding sitting by a window, and using special nasal sprays if symptoms are provoked.   Despite all these precautions, the impact of the travel was such that Ms. Hughes wound up in a wheelchair, unable to walk, with exacerbated symptoms on both ends of her trip. The lights, chaos and motion in the airport predictably exacerbated her symptoms.   Vestibular therapist Gaye

Cronin confirmed these same facts in her records.

59.     Hartford unreasonably construed this disaster of a trip as evidence that Ms. Hughes could somehow tolerate consistent, full time employment.

60.     During the interview Ms. Hughes also did not deny the activity noted during surveillance.  Ms. Hughes explained that when her symptoms are tolerable, her doctors encourage her to do as much non-physically demanding activity as she can tolerate, at her own pace and on her own schedule.   However, she also confirmed that when her symptoms are active she cannot do *anything* productive.

61.     The information Ms. Hughes provided during her interview is entirely consistent with the limited activity observed during surveillance and with all the other evidence Hartford previously found supportive of Ms. Hughes "Any Occupation" disability.

62.     Hartford next had its employee Nurse, Ms. Maitland, review the file on August 3, 2016.  Ms. Maitland noted that the claim was being "proactively reviewed for investigation as the restrictions and limitations appear to be overstated." This opening line suggests an unwarranted level of suspicion about the claim and a predisposition toward a negative outcome in the "investigation."

63.     Nurse Maitland reiterated that on a "great day" Ms. Hughes could walk 45 minutes, though she tries to walk 25 minutes a day.  She also noted that

Ms. Hughes reported that <u>at times</u> she can do laundry or sweep the floor, or do the dusting "if she is feeling better."  <u>Sometimes</u> she gets outside and will pull some weeds.  <u>Sometimes</u> she can grill, and <u>sometimes</u> she can mow the grass, in increments.  Hartford has consistently ignored that Ms. Hughes has never claimed to be disabled from all activity all the time.

64.    Ms. Maitland next referred the case to a neurologist, Joseph Jares, for review. Dr. Jares did not examine Ms. Hughes. His conclusions are, by definition, limited to what he could glean from the medical records, the surveillance evidence and Ms. Hughes' interview.

65.    Every treating provider whose records Dr. Jares reviewed confirmed that Ms. Hughes is totally disabled from performing any full time work.

66.    Dr. Jares noted that Ms. Hughes suffered from a history of Meniere's syndrome, migraine headaches, congenital heart disease, TMJ syndrome, allergies, and hypersomnia. Dr. Jares reviewed the surveillance, and then asserted: "Pt may sit unrestricted.  Stand up to 10 minutes at a time, up to one hour total in an 8 hour work shift.  Frequently carry 0-10 pounds occasionally.  Should not bend, kneel, stoop, crouch, or crawl due to potential of exacerbating vertigo.  No working at heights.  No driving or operating machinery for employment purposes.  May work at computer 30 minutes -- then a 2-3 minute break."  Dr. Jares did not explain how

the three hours, total, of light activity taken from 18 hours of surveillance could possibly support his leap of logic.

67.    In Hartford's Claim File Notes, Cassandra Jung next noted that the "claim is terminated as a direct result of SIU [Special Investigation Unit] involvement" and the decision was supported by Dennis Birchland, Manager of the Minneapolis Claim Department. This is Hartford "code" for terminating benefits based on meaningless surveillance evidence.

68.    Hartford unilaterally terminated Ms. Hughes' benefits in a letter dated October 6, 2016, by Ms. Susan H. Peterson. (The Termination Letter). Hartford asserted, *"We have concluded from the combination of all the medical information in your file that you are able to perform sedentary occupations that allow you to take breaks from the computer screen every 30 minutes."*

69.    Hartford agreed that Ms. Hughes was disabled under the Any Occupation definition from November 24, 2014 through October 5, 2016. Its termination of benefits was in the absence of any evidence that Ms. Hughes' condition had improved significantly – in fact all the evidence unanimously confirms that she had *not* improved.

70.    In December of 2016, Ms. Hughes retained counsel to assist her in preparing an appeal to Hartford's termination of her LTD benefits.

71.    On March 28, 2017, Ms. Hughes, through her attorneys, provided Hartford with her administrative appeal of Hartford's decision to terminate her LTD benefits on October 6, 2016. ("the Appeal").  The Appeal included a 20-page letter from counsel presenting evidence and arguments, and several hundred pages of evidentiary exhibits.

72.    The central theme of Ms. Hughes' Appeal was that Dr. Jares' analysis, the surveillance footage, and Hartford's decision all completely overlooked the central issue of this disability claim: Ms. Hughes is not *always* symptomatic, however she *frequently* is.  Sometimes she is able to do short periods of light activity. She is symptomatic more days than she is not, often for hours at a time. When she is symptomatic she is *totally incapacitated*. This happens so often that she totally unreliable as an employee, and is therefore unemployable in any occupation.

73.    In the Appeal, Ms. Hughes provided Hartford with proof that she has been Disabled at all relevant times within the meaning of the Policy and entitled to LTD benefits since the date benefits were terminated, and continuing.

74.    In the Appeal, Ms. Hughes provided Hartford with extensive medical literature, confirming that her migraine and vestibular conditions are both medically plausible and commonly disabling.

75.    Ms. Hughes provided Hartford with a two month headache journal, which establishes in detail the frequency, severity, and duration of her disabling headaches. In January 2016 she had incapacitating headaches 21 out of 31 days, most lasting four to twelve hours in duration. Ms. Hughes confirmed that these logs are representative of her life and symptoms on an ongoing basis.

76.    Ms. Hughes also provided the following statement regarding her condition:

*My headaches and vertigo vary even in a day. Sometimes I may have no symptoms and yet symptoms may start suddenly with (or even without) increased activity. Other times, with mild symptoms and where I am still functional, some light activity may improve symptoms, and at other times make me feel more ill.*

*On any given day, what began as a severe headache at one point in the day may improve briefly after medication. When or if it improves, I often test my ability to tolerate activity. Most times the headache will return to the previous intensity after just a few minutes, and I have to lie back down. I do have months where the migraines are fewer, and then there are also months I have near-daily headaches in addition to more migraines with and without vertigo. I have never had a month during the last year when I did not have numerous incapacitating headaches. You will note I kept a headache journal for two months at my attorney's request. This was intended to provide a real time snapshot of just how often I experience these symptoms. The journals are representative of my life during the time now under review. The headaches and migraines often weave in and out through the day and depending on stress and/or activity.*

*I also have vertigo with and without headaches. When I have increased stress and/or try to be active, the symptoms appear, and*

*they often become more severe, last longer and are more frequent. Any one of these symptoms causes me to have to lie down for a period of time until hopefully they pass.  I cannot do anything productive when my vertigo is bad.  It gets to the point that the room is spinning and I get nauseous and even dry heave.  Imagine me trying to get through a work day but curled up on the floor in this condition.  I wouldn't even be able to get myself home.*

77.     In her Appeal, Ms. Hughes provided corroborating witness statements from two lay witnesses and Nurse Practitioner Brandy Hughes, all confirming that Ms. Hughes loved her job as a pediatric nurse, and is not the type of person to exaggerate or fake a disability. All of them confirmed they have personally observed how frequent and debilitating Ms. Hughes' symptoms have been.

78.     Ms. Hughes provided the transcript of a lengthy and detailed interview with vestibular expert and treating therapist Gaye Cronin confirming that Ms. Hughes has constant vestibular symptoms on a daily basis that vary in intensity.

79.     Dr. Cronin confirmed that once Ms. Hughes' symptoms are provoked, it becomes impossible for her to concentrate or be productive.  Her only option is to lie down and ride out the symptoms.  Dr. Cronin confirmed that the symptoms are provoked by bright lights, motion, reading, and use of a computer, among other things.  These are all common triggers for vestibular patients.

80.     Dr. Cronin addressed the surveillance footage, and stated that Ms.

Hughes is *encouraged* to be active when she is able.  She also noted that Ms. Hughes moved slowly, and not normally, on the surveillance video because she has a balance problem.  Dr. Cronin indicated that sometimes Ms. Hughes' gait is normal.  Other times when she is symptomatic her gait is ataxic, meaning she has decreased weight bearing or is unable to move except at a very slow pace.  Dr. Cronin has also encouraged Ms. Hughes to move as much as she can to prevent additional problems in her muscles, joints, and heart due to inactivity.

81.    Dr. Cronin confirmed that the surveillance evidence in no way proves Ms. Hughes has lied or exaggerated, or that she is able to work.

82.    Given that it is impossible for Ms. Hughes to function *at all* when she is symptomatic, Dr. Cronin reiterated that she is unable to reliably and consistently perform any full-time job.

83.    Ms. Hughes provided the transcript of an interview with her ENT, Dr. Hoffmann, who opined that her practice also encourages patients, even those that suffer with balance and disequilibrium such as Ms. Hughes, to be as active as possible.

84.    Dr. Hoffmann reiterated that walking with a slow deliberate gait, does not mean Ms. Hughes is cured or capable of consistent productivity in a work

setting.  Dr. Hoffmann confirms that just because Ms. Hughes can *sometimes* walk her dog for a short period of time, does not mean she can maintain a full-time job.

85.    Thus, both of Ms. Hughes' primary treaters confirmed that the surveillance revealed that Ms. Hughes was following her doctors' orders by performing non-physically demanding activities for very short periods of time on days when her symptoms allowed. Hartford is unfairly trying to penalize her for being a compliant patient.

86.    Dr. Hoffmann confirmed that at her last visit in April of 2016, Ms. Hughes was still experiencing vestibular problems and headaches provoked by fluorescent lights and computer usage – all of which are common in a modern workplace.

87.    Dr. Hoffmann confirmed that Ms. Hughes would be totally incapacitated by almost any work environment given that her symptoms are triggered by bright lights, motion, loud noises and computers.

88.    Dr. Hoffman explained that Ms. Hughes' symptoms stemmed in part from a failed attempt to destroy the malfunctioning left side of her vestibular system with Gentamycin. Although the hope was that the stronger right side of her vestibular system would take over, this did not occur.  Ms. Hughes symptoms worsened after the treatment.

89.    Dr. Hoffman confirmed in her interview that all of Ms. Hughes' complaints are medically credible and consistent with her clinical presentation over time.

90.    Both Dr. Cronin and Dr. Hoffman confirmed that Ms. Hughes has undergone objective vestibular testing during her treatment with them, including nystagmogram, audiogram and posturography tests, all of which consistently verified Ms. Hughes' vestibular disorder.

91.    A nystagmogram is an objective test in which a patient's eye and head movements are recorded by video goggles equipped with infrared cameras.  Ms. Hughes' nystagmogram test revealed nystagmus, which is characterized by abnormal and jerky eye movements.  Nystagmus is an objective vestibular finding that cannot be faked or simulated.

92.    An audiogram is an objective test that measures hearing loss.  Ms. Hughes' audiogram reveled abnormal results, which is an objective vestibular finding that cannot be faked or simulated.

93.    A posturography is an objective standardized test that measures balance.  Ms. Hughes' posturography revealed abnormal results, which is an objective vestibular finding that cannot be faked or simulated.

94.   Dr. Hoffmann also found the content of Ms. Hughes' headache journals to be accurate, given that Ms. Hughes is very straightforward and consistent in her descriptions of the headaches.

95.   Dr. Hoffmann also clarified her notations of "improvement" in her records which disability insurers sometimes intentionally take out of context.  Dr. Hoffman confirms she only annotated the record to note that Ms. Hughes was showing some specific improvement while engaged in the vestibular rehabilitation group (Dr. Cronin), and that her balance had improved.  Dr. Hoffmann did <u>not</u> intend to suggest or imply that Ms. Hughes had recovered to a full time work capacity.

96.   Dr. Hoffmann noted that while she rarely finds a patient completely disabled, Ms. Hughes is "one of her worst patients," and her problems are more complex and severe than most of Dr. Hoffmann's others patients.  Consequently, Dr. Hoffmann fails to see how Ms. Hughes' complete disability status is even debatable.

97.   After receiving Ms. Hughes' Appeal, Hartford notified Ms. Hughes' counsel of its intent to send her for an insurance medical examination with a well-known defense-oriented neurologist, Dr. Schiff, on May 11, 2017.

98.    By letter dated April 18, 2017, Ms. Hughes' counsel notified Hartford of his concerns about Dr. Schiff's objectivity, and requested Hartford provide a copy of Dr. Schiff's report so that Ms. Hughes might have an opportunity to respond.

99.    On June 6, 2017, counsel for Ms. Hughes provided Hartford with an email from Ms. Hughes documenting her somewhat negative IME experience, in which Dr. Schiff behaved increasingly hostilely toward her.

100.    On June 27, 2017, counsel for Ms. Hughes sent Hartford a second letter requesting a copy of Dr. Schiff's IME report so she might be able respond.

101.    On June 29, 2017, Hartford wrote a letter upholding its termination of Ms. Hughes' LTD benefits *without having allowed Ms. Hughes to respond concerning Dr. Schiff's insurance medical examination*. ("the Appeal Decision").

102.    *After* Harford had already denied the Appeal, it provided Ms. Hughes a copy of Dr. Schiff's report.  The report confirms a fairly cursory neurological examination.  More importantly, it confirms that Dr. Schiff failed to administer *any* objective vestibular tests, despite the fact that previous objective vestibular testing has consistently verified Ms. Hughes' disorder.  In other words, Dr. Schiff appears to have designed an examination which *carefully avoided* confirming Ms. Hughes symptoms.

103.   Having failed to administer the appropriate objective tests, Dr. Schiff instead based his IME opinion on his review of the surveillance footage provided by Hartford.  Like every other player on Hartford's team, Dr. Schiff chose to take this footage completely out of context, ignoring Ms. Hughes medical records, ignoring her objectively abnormal test results, ignoring Ms. Hughes' history and statements, ignoring the lay witness statements and the detailed doctor statements Hartford had been provided.

104.   Dr. Schiff's examination was careless, biased or both.  It does not constitute substantial evidence that would overcome the huge body of evidence confirming Ms. Hughes' total disability.

105.   Hartford intentionally "sandbagged" Ms. Hughes with Dr. Schiff's report, seeking to close the record without giving her, her doctors, or her attorney an opportunity to respond.  This is a violation of ERISA's guarantee of "full and fair review."

106.   Hartford arbitrarily and unreasonably based its Appeal Decision exclusively on the opinion of its IME physician, Dr. Schiff, over the opinions over Ms. Hughes longstanding treaters and the large body of objective data supporting her disability claim.

107.   Hartford's decision also presents a classic case of "cherry picking" the record to emphasize evidence purporting to support a claim denial, while minimizing or ignoring a much larger and higher quality body of evidence establishing Ms. Hughes' entitlement to benefits.

## COUNT I: BENEFITS DUE UNDER 29 U.S.C. § 1132(a)(1)(B)

108.   Plaintiff hereby repeats and realleges the allegations of Paragraphs 1 through 106 above, as if set forth verbatim herein.

109.   Defendant Hartford's refusal to pay LTD benefits beyond October 5, 2016 violates the terms of the Policy, wrong, and unreasonable, and completely contrary to the weight of credible evidence in its file.

110.   At all relevant times, Hartford has been operating under an inherent and structural conflict of interest as Hartford is liable for benefit payments due to Plaintiff and each payment depletes Hartford's assets.

111.   Hartford's determination was influenced by this conflict of interest.

112.   Hartford has failed to take active steps to reduce potential bias and to promote the accuracy of its benefit determinations.

113.   On or about January 14, 2016, the Social Security Administration ("SSA") determined that Ms. Hughes was disabled from any substantial, gainful employment since August 27, 2012.

114.   Although Hartford paid lip service to considering the SSA determination that Ms. Hughes was and remains disabled, it did not actually give any weight to the decision.  This is further evidence that Hartford's decision was influenced by its inherent structure and financial conflict of interest.

115.   Ms. Hughes is entitled to LTD benefits under the Plan retroactive to the date benefits were terminated and continuing through the date of this Court's final judgment.

116.   Ms. Hughes is further entitled to interest on all past due amounts pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B).

117.   Plaintiff has retained counsel to represent her in this matter, and is entitled to an award of costs, including a reasonable attorney's fee, pursuant to ERISA 29 U.S.C. § 1132(g)(1).

WHEREFORE, Ms. Hughes prays for relief in the following forms:

a) An order finding Defendant's termination of Plaintiff's benefits was an abuse of discretion, together with an award of Plaintiff's litigation expenses, including reasonable attorney's fee;

b) An award of long term disability benefits retroactive to October 5, 2016, and continuing through the date of this Court's judgement, plus prejudgment interest and Plaintiff's reasonable expenses of litigation,

including a reasonable attorney's fee; and

c) Such other and further relief as the Court may deem just and proper.

Dated:       New York, New York
             September 18, 2017

                        RIEMER & ASSOCIATES LLC
                        Attorneys for Plaintiff
                        60 East 42nd Street, Suite 1750
                        New York, New York 10165
                        (212) 297-0700

             By:    /s/ Scott M. Riemer
                    Scott M. Riemer (ct 28517)