## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PATRICIA HUGHES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action File |
| | § | No. 3:17-cv-01561-JAM |
| | § | |
| THE HARTFORD LIFE & ACCIDENT | § | |
| INSURANCE CO., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### Statement of the Case

Plaintiff brought this action pursuant to ERISA Section 502 (29 U.S.C. § 1132) to obtain judicial review of a termination of long term disability (LTD) benefits under an ERISA-governed welfare benefit plan, under which Plaintiff was covered by virtue of her employment with Children's Healthcare of Atlanta. Plaintiff has exhausted the required administrative appeals and this Court now has jurisdiction over the denial of her benefits.

### Factual History

*Administrative History*

Patricia Hughes worked for Children's Healthcare of Atlanta; by virtue of that employment, she was covered by a Hartford-underwritten long-term disability insurance policy. Complaint ¶¶ 1, 6, 7.  Beginning in 2011, she began suffering intermittent episodes of vertigo, as well as migraine headaches.  She was subsequently diagnosed with a vestibular disorder.  *See infra*.  Ms. Hughes ultimately ceased work due to her medical condition in August, 2012.  AR p.

1

601.  She applied for benefits under the policy, which Hartford approved, and commenced paying benefits on November 26, 2012.  *Id.*

In 2016, Hartford ratcheted up its scrutiny of the claim, referring it to its "Special Investigations Unit"  (SIU).  The SIU arranged surveillance and referred the file to a non-examining "peer review" physician.  AR pp. 1450-55; 1429-36.  On the basis of the surveillance and peer review physician, Hartford terminated benefits by letter dated October 6, 2016.  AR pp. 311-16.

Through counsel, Ms. Hughes timely appealed this denial.  Ms. Hughes provided Hartford with, *inter alia,* two months' worth of daily symptom logs establishing frequent periods of total incapacitation*,* recorded statements from her treating physicians detailing their opinions that she remained disabled due to her vestibular dysfunction, explaining the basis for the diagnosis of vestibular dysfunction, and confirming that the activities observed on surveillance did not contradict Ms. Hughes' debilitating but intermittent symptoms.  *See generally* AR pp. 920-1011.

Following that appeal, Hartford sought an independent medical examination by neurologist Arthur Schiff, M.D.  Dr. Schiff found no restrictions beyond a need to avoid heights and similar hazards; relying largely on the surveillance he described Ms. Hughes's vestibular dysfunction as "questionable."  AR pp. 827-32.  Expressly relying on Dr. Schiff's report, Hartford upheld its termination of benefits by letter dated June 29, 2017; this letter stated that the decision was final, and Hartford would not consider any further appeal.  AR pp. 296-304.

Prior to Hartford's final denial, Ms. Hughes, through counsel, twice requested that Hartford provide a copy of Dr. Schiff's report so she might have the opportunity to respond before a final decision was made.  AR pp. 852, 819.  Hartford ignored both written requests.

Instead, it made its June 29, 2017, decision without ever affording Plaintiff an opportunity to address the report, and did not provide Dr. Schiff's report until after the final decision had been made.

*Ms. Hughes's Medical Providers*

Ms. Hughes' alleged disability is based on chronic vertigo with associated migraine headaches.  By her description:

> These symptoms increase in frequency, duration and intensity with reading, activity and stress. On most days, I require lying down several times a day. The rest periods are required after doing mundane activities around the home, such as folding laundry, stacking the dishes, etc., going to the grocery store for a couple of things, medical appointments, being on the computer or reading. I do a task then lay down for 20 minutes to an hour and repeat this throughout the day. Sometimes I am able to push through an entire day without a break, but end up paying for it due to fatigue and or increased symptoms for the next day or two. Things which are most bothersome and increase my symptoms are fluorescent lights, busy indoor sounds and motion (i.e., grocery store), riding in a car with sunlight flashing through trees, moving windshield wipers, sometimes just riding in a car, certain scents, frequent repetitive bending, and working on computer and or reading.

AR p. 926.

Her principal physicians are Dr. Karen Hoffmann, a board certified neuro-otologist, and Dr. Gaye Cronin, Ph.D., a vestibular therapist. They ultimately diagnosed Ms. Hughes with peripheral vertigo and associated migraines.  As stated by Dr. Cronin:

> Okay, well, the diagnosis, the primary diagnosis we're treating her for her is disabling peripheral vertigo. And that just means inner ear vestibular vertigo.

AR p. 950.

Each doctor explained that the diagnosis was on the basis of objective testing.  As explained by Dr. Cronin:

> Well, we do what is called a nystagmogram. We put video goggles on the patient that have infrared cameras, and we watch various eye and head movements, and on those tests which are standardized, she had abnormal eye movements, jerky eyes which is called nystagmus and that is an objective finding. You can't make your eyes jerk or not

3

jerk and she did have that, and that's a vestibular finding on the way they presented, and also she had a lot different balance issues. There's forms of clinical balance tests called posturography. We have them stand on a platform that measures their sway, their ability to maintain their balance in different situations and those were abnormal. And that's, again, a standardized test based on a person's age and size . . . Then on our vertigo assessment, she did have vertigo with different positional head, neck and body movements and demonstrated again nystagmus which is that oscillation of the eye.

AR pp. 942-43.  Likewise, Dr. Hoffmann explained:

She had a vestibular test called a VNG, or ENG, electronystagmography, and that showed a 25 percent weakness of her left inner ear. So a difference between the two ears of 20 percent is not considered significant, so a 25 percent difference between the two ears means the left inner ear was not functioning as well.

AR p. 977.

Dr. Cronin described:

It's hard to concentrate. Your brain is very preoccupied. Plus, if you're sick, it is hard to concentrate. She has these really extreme headaches that are very hard to tolerate and your head's hurting. It's hard to focus on anything with all the symptoms. She may have one or two of those and some days, it maybe the whole gamut of all the symptoms. And that's when she is very dysfunctional. She basically just has to lie down and ride it out.

AR p. 945.  Movement and visual motion, including reading and computer use, function as triggers for debilitating symptoms.  AR p. 944.  Dr. Cronin recommended that Ms. Hughes could engage in activities of daily living as tolerated, in a home environment where she can control the stimuli she is subjected to.  AR p. 945.  In a work environment, however, Dr. Cronin opined:

With her tolerances so low for visual motion and a lot of her work was at the computer and things like that, I just don't think that she could tolerate that for more than a few minutes at a time and that's not going to be productive . . . I just don't think she can do it—and plus, then on some days, she might could work an hour, but then some days, she might work 10 minutes and you can't do a job like that.

AR p. 946.  Dr. Hoffmann similarly emphasized that due to intermittent symptoms of vertigo and headache, particularly with computer screens and fluorescent lighting acting as a trigger, that Ms. Hughes could not sustain a full time work schedule.  *See* AR pp. 985, 988-89.

*Surveillance*

Hartford commenced its greater scrutiny of Ms. Hughes' claim by obtaining surveillance. On April 15, 2016, about 9 hours of surveillance was performed. During this 9-hour period, Ms. Hughes was confined to her home for 8 hours and 45 minutes. The only activity observed during the entire 9-hour surveillance period was a mere 16 minutes during which Ms. Hughes walked her dog slowly through her neighborhood. On April 26, 2016, Hartford once again arranged surreptitious surveillance during which Ms. Hughes was confined to her home for 6 and one-half hours. The only activity observed was when Ms. Hughes again walked her dog for about 24 minutes, and performed light gardening (mainly weeding in a stationary seated or kneeling position) with assistance from a friend on and off for about two hours.  AR pp. 1450-55.

Ms. Hughes' physicians commented on this surveillance as part of the appeal.  Reviewing the surveillance report, Dr. Cronin stated:

> No. She felt well enough maybe to do that for a little bit at a time. And we do encourage her to do as much as she can because otherwise everything else, such as her muscles, joints, heart, everything's going to get off if you're not doing much movement. We encourage her to move when she feels like it . . .
>
> I don't see any inconsistencies. That doesn't jump at me like oh, my gosh. You know, 1didn't know she was doing that. You know, she's very honest with us about what she does. And, she kind of gets excited if she'd have a day where she can do a little bit more. You know, that we want her to move around, because this can be a very kind of depressing condition, too, if you're feeling bad all the time and feel like you can't do anything.

AR p. 954-55.

Likewise, Dr. Hoffmann stated:

> We encourage the patients, even with balance trouble, to get up and walk around, and so she had slow, deliberate gait, that doesn't necessarily mean she's back to full steam. We also have noted that she had improved from being completely incapacitated and walking with a cane at some point and potentially even showing up in a wheelchair, she has now recovered enough function to be able to walk, but that doesn't mean that she was walking as quickly or with as much deliberate movement as what we would expect you would

need to function, say moving around the hall and moving patients around, and so I don't know that that really showed that she had normal activity. It just shows she has had some improvement.

AR p. 987.

*Peer Reviewer Dr. Jares*

Hartford's initial termination of benefits was founded on the report of peer reviewer Dr. Jares. Dr. Jares did not examine Ms. Hughes, but instead based his report on his review of medical records and the surveillance footage of Ms. Hughes. Dr. Jares did not dispute that Ms. Hughes genuinely suffers a vestibular disorder, or that she suffers episodic vertigo as a result. Based upon surveillance video, however, he disputed the frequency and severity of that vertigo. He asserted Ms. Hughes could perform a sedentary occupation, so long as she was afforded the opportunity to take two to three minute breaks from computer screens every thirty minutes. AR pp. 1429-36.

*Independent Medical Examiner Dr. Schiff*

Following Ms. Hughes's appeal, Hartford obtained an insurance medical examination from neurologist Dr. Schiff. Dr. Schiff generally reports his *neurological* examination as normal. He did not appear to perform a comprehensive *vestibular* examination. He apparently doubted that Ms. Hughes had a vestibular disorder, calling it "questionable," though he did opine that Ms. Hughes should avoid unprotected heights or hazards. He assigned essentially no other limitations. AR pp. 827-32.

Dr. Schiff's report confirms he did not administer an audiogram, caloric testing, nystagmography nor posturography that Drs. Cronin and Hoffmann confirm have been historically abnormal and confirmatory of Ms. Hughes diagnosis and symptoms. In fact, Dr. Schiff's report does not even acknowledge the abnormal objective test results in the records of

Drs. Cronin and Hoffmann.  Dr. Schiff's report does list the evidence he reviewed; the recorded statements of Drs. Cronin and Hoffmann offered with Ms. Hughes' appeal do not appear on that list.  AR pp. 827-32. Nor does Ms. Hughes' two months of daily, detailed symptom journals.

*Rebuttal of Dr. Schiff's Opinion*

Through counsel, Ms. Hughes twice requested that Hartford allow her the opportunity to review and address Dr. Schiff's report before a decision was reached; Hartford ignored these letters and issued a final denial of the claim before providing Dr. Schiff's report.  Both of Ms. Hughes doctors and Ms. Hughes herself and her live-in partner *did* have a response to Dr. Schiff's report, all of which are now attached as four affidavit exhibits to this pleading.  (See, Dr. Hoffmann affidavit, Exh. A; Dr. Cronin, Exh. B; Patricia Hughes, Exh. C; and Jeanie Jones, Exh. D).

In their affidavits, Drs. Hoffmann and Cronin question, as discussed more fully below, whether a neurologist was the correct specialist to evaluate what is fundamentally a vestibular disability.  Exhs. A and B.  Dr. Hoffman also questioned the testing Dr. Schiff performed:

> Most neurologists do not perform vestibular testing; they generally do not even possess the equipment to do it.  Dr. Schiff seems to be no different.  The "finger in front of the eye" nystagmus test often leads to false negatives simply because it is not nearly as sensitive as objective, video-goggle based eye measurements . . . Dr. Schiff did not perform any of the tests which actually have been historically abnormal for Ms. Hughes including audiogram, video ENG, or posturography, so he seems to have omitted the most relevant data from his examination.

*Id.*

Dr. Cronin likewise criticizes Dr. Schiff's report.  She noted that she frequently discusses patients' cases with IME or record review doctors, but that neither Hartford nor Dr. Schiff contacted her to give her that opportunity.  Exh. B.  She highlighted Ms. Hughes' abnormal objective test reports on both video electronystagmography and on posturography.  She criticized

Dr. Schiff for neither addressing these results in his report nor conducting those tests himself. *Id.* She noted that the only testing Dr. Schiff performed that assessed vestibular function was the crude "moving finger in front of the eye" test to see if the eyes jump rather than move fluidly. *Id.* She noted this test is far less sensitive than video ENG, which is a much more demanding, accurate, and objective measure, and Ms. Hughes' video ENGs have been consistently abnormal. *Id.* In Dr. Cronin's words, "Dr. Schiff's notation of a 'normal' nystagmus test says more about the poor quality of his evaluation than it does about Ms. Hughes' consistency of presentation or her ability to work."

*Id.*

Ms. Hughes has also provided an affidavit.  Exh. C.  Most significantly, she states that she brought the materials that constituted her appeal, including the explanatory statements from Drs. Cronin and Hoffmann to the appointment, but Dr. Schiff refused to receive or review that information.  *Id.*  This suggests Dr. Schiff himself intentionally engaged in a selective review of evidence.

## Standard of Review

Hartford's decision should be reviewed under the *de novo* standard of review. A benefit determination is reviewed *de novo*, unless the plan vests the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Plaintiff would concede that there is a grant of discretion in the instant policy.  But, even where there is a valid grant of discretion, that does not guarantee the administrator a deferential review. In *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016), the Second Circuit found that "when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulations, 29 C.F.R. §2560.503-1,

will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in conforming with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." *Id*. at 45. The Court also found that the plan has the burden to demonstrate compliance with the claims procedure regulations, and that "substantial compliance" with the regulations is not sufficient to trigger an arbitrary and capricious review. *Id*. at 56, 58. Rather, a plan administrator must "strictly adhere to the regulation." *Id*. at 56.

Hartford's decision making, and particularly its reliance on the IME opinion of Dr. Schiff, fails the claims-procedure guarantee of a full and fair review in several key ways.  First and foremost, Plaintiff twice requested that Hartford provide a copy of Dr. Schiff's report prior to making a decision, to allow Plaintiff the opportunity to address and rebut that report; Hartford ignored these requests completely, and made a final decision to deny the claim without affording Plaintiff the opportunity to confront the evidence on which it relied.

Regulations provide that to comply with ERISA's mandate of a full and fair review, plans providing disability benefits must:

> Provide claimants the opportunity to provide written comments, documents, records, and other information relating to the claim for benefits ... [and] provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503–1(h)(2)(ii), (iv).  A fair review thus necessarily requires an opportunity to review and rebut the basis of the denial determination. *See, Crocco v. Xerox Cor*p., 137 F.3d 105, 108 (2d Cir.1998) (affirming district court's judgment, based on *Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W., Local 813*, 715 F.2d 853 (3d Cir.1983), that "full and fair review" was not provided); *Grossmulle*r, 715 F.2d at 857–58

(stating that full and fair review requires that claimant be presented with all relevant evidence and be afforded an opportunity to respond to that evidence). *See also Cohen v. Metropolitan Life Ins. Co.*, 485 F.Supp.2d 339, 353 (S.D.N.Y.2007) (no full and fair review when insurer relies on reports not provided to plaintiff before final denial); *Solomon v. Metropolitan Life Ins. Co*., 628 F.Supp.2d 519 (S.D.N.Y. 2009) (same, and awarding benefits as a matter of law on this very basis).

This is no mere technical complaint; the affidavits provided by Ms. Hughes's physicians demonstrate they certainly did have a rebuttal to Dr. Schiff.   In her affidavit, Dr. Hoffmann questioned whether Dr. Schiff was even the correct specialist for Ms. Hughes's condition:

> I do not feel that a neurologist was the right choice to conduct an examination of Ms. Hughes . . . Most neurologists focus on the central and peripheral nervous systems. Vestibular problems are much more complicated, involving the central nervous system, peripheral nervous system, sight, hearing, and proprioception with the extremities, all in a very complex relationship.

Exhibit A.  She also questioned the testing performed:

> Most neurologists do not perform vestibular testing; they generally do not even possess the equipment to do it.  Dr. Schiff seems to be no different.  The "finger in front of the eye" nystagmus test often leads to false negatives simply because it is not nearly as sensitive as objective, video-goggle based eye measurements . . . Dr. Schiff did not perform any of the tests which actually have been historically abnormal for Ms. Hughes including audiogram, video ENG, or posturography, so he seems to have omitted the most relevant data from his examination.

*Id.*

Dr. Cronin likewise criticized Dr. Schiff's report.  She noted that she frequently discusses patients' cases with IME or record review doctors, but that neither Hartford not Dr. Schiff himself contacted her.  Exhibit B.  She highlighted Ms. Hughes's abnormal objective test reports on both video electronystagmography and on posturography.   She criticized Dr. Schiff for neither addressing these results in his report nor conducting those tests himself:

> Dr. Schiff did the same crude nystagmus test that most non-vestibular experts would use, a simple instruction to the patient to hold her head still while having the eyes follow his finger moving side to side.  The doctor then notes whether nystagmus occurs, which is merely a side to side beating of the eyes rather than a smooth movement.   Moreover, Ms. Hughes' vestibular therapy has specifically trained her to be able to control this simple maneuver.  Ms. Hughes nystagmus is typically provoked by watching visually moving environments and stimulation such as a computer, eye-head motion and also following head movements, so following a simple target with the head still is not adequate to assess her nystagmus. Video ENG is a much more demanding, accurate, and an objective measure, and Ms. Hughes' video ENGs have been consistently abnormal. Dr. Schiff's notation of a "normal" nystagmus test says more about the poor quality of his evaluation than it does about Ms. Hughes' consistency of presentation or her ability to work.

*Id.*

An insurer may not attempt to render a piece of evidence irrebuttable by hiding it from the claimant until after the insurance company makes a final decision.  Hartford made several other errors with respect to Dr. Schiff's report:  it relied on a doctor of the wrong specialty to evaluate vestibular disorders; and it relied on a physician who either did not review or did not consider the entire record.  *See infra*. But to deprive Ms. Hughes of the opportunity to review and rebut the evidence that was ultimately given controlling weight in denying benefits is a complete contravention of the claims procedures' guarantee of a full and fair review.  Consistent with *Halo*, a *de novo* standard of review must therefore apply.

**Issues**

I.  Based upon the opinions of her treating physicians, Ms. Hughes is disabled as defined by the policy.

II.  Under any standard of review, Hartford's reliance on the independent medical examination conducted by Dr. Schiff is unwarranted:

A.  Hartford may not rely on evidence Ms. Hughes was not given the opportunity to review or rebut.

11

B.  Dr. Schiff's opinion is fatally flawed by his failure and outright refusal to review and/or address key evidence before offering his opinion.

C.  Dr. Schiff is the wrong specialty to consider Ms. Hughes's vestibular disorder.

D.  Dr. Schiff's opinion is grossly at odds with the remainder of the record.

III.  Hartford erroneously relies upon brief periods of surveillance footage to determine the credibility of inherently variable symptoms.

IV.  Hartford erroneously terminates benefits in the absence of any evidence of improvement.

**Law and Argument**

**I.  Based upon the opinions of her treating physicians, Ms. Hughes is disabled as defined by the policy.**

Ms. Hughes applied for—and was, of course, awarded by Hartford—disability benefits on the basis of chronic vertigo and headaches for more than four years.  By Ms. Hughes' description:

> These symptoms increase in frequency, duration and intensity with reading, activity and stress. On most days, I require lying down several times a day. The rest periods are required after doing mundane activities around the home, such as folding laundry, stacking the dishes, etc., going to the grocery store for a couple of things, medical appointments, being on the computer or reading. I do a task then lay down for 20 minutes to an hour and repeat this throughout the day. Sometimes I am able to push through an entire day without a break, but end up paying for it due to fatigue and or increased symptoms for the next day or two. Things which are most bothersome and increase my symptoms are fluorescent lights, busy indoor sounds and motion (i.e., grocery store), riding in a car with sunlight flashing through frees, moving windshield wipers, sometimes just riding in a car, certain scents, frequent repetitive bending, and working on computer and or reading.

AR p. 926.

Her principal physicians are Dr. Karen Hoffmann, a neuro-otologist, and Dr. Gaye Cronin, Ph.D., a vestibular therapist.  They ultimately diagnose Ms. Hughes with peripheral vertigo and associated migraines.  As stated by Dr. Cronin:

> Okay, well, the diagnosis, the primary diagnosis we're treating her for her is disabling peripheral vertigo. And that just means inner ear vestibular vertigo.

AR p. 950.

Each doctor agreed that Ms. Hughes's vertigo and associated headache symptoms would be disabling:  Dr. Cronin described:

> It's hard to concentrate. Your brain is very preoccupied. Plus, if you're sick, it is hard to concentrate. She has these really extreme headaches that are very hard to tolerate and your head's hurting. It's hard to focus on anything with all the symptoms. She may have one or two of those and some days, it maybe the whole gamut of all the symptoms. And that's when she is very dysfunctional. She basically just has to lie down and ride it out.

AR p. 945.  Movement and visual motion, including reading and computer use, are triggers for incapacitating symptoms.  AR p. 944.  Dr. Cronin recommended that Ms. Hughes could engage in activities of daily living as tolerated, in a home environment where she can control the stimuli she is subjected to.  AR p. 945.  In a work environment, however, Dr. Cronin opined:

> With her tolerances so low for visual motion and a lot of her work was at the computer and things like that, I just don't think that she could tolerate that for more than a few minutes at a time and that's not going to be productive . . . I just don't think she can do it—and plus, then on some days, she might could work an hour, but then some days, she might work 10 minutes and you can't do a job like that.

AR p. 946.  Dr. Hoffmann similarly emphasized that due to intermittent symptoms of vertigo and headache, particularly with computer screens and fluorescent lighting acting as a trigger, that Ms. Hughes could not sustain a full time work schedule.  See AR pp. 985, 988-89.

Workplace attendance, whether measured in terms of full-day absences or excessive breaks during the day, is an essential job duty in any occupation. "An employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Wimbley v.*

*Bolger,* 642 F.Supp. 481,485 (W.D.Tenn.1986)), *affd,* 831 F.2d 298 (6th Cir.l987). Every occupation, without exception, requires the employee to show up reliably and consistently, and to have sufficient energy to work at a productive pace throughout the day. "In order to perform a job satisfactorily, to carry out its duties, a worker must be able to perform the tasks it requires from the beginning to the end of the work day.  . . .This is another way of saying that the duty of a job is to perform its tasks as many times, and as long throughout the work day, as the job requires." *Tippitt v. Reliance Std. Life Ins. Co.*, 457 F.3d 1227, 1236 (11th Cir. 2006).  Numerous cases decided under the Americans with Disabilities Act likewise hold that frequent absences will render an individual unable to perform the essential duties of his occupation. *See, e.g., Murphy v. ITT Educational Services, Inc.,* 176 F.3d 934 (7th Cir.1999); *Morgan v. Hilti, Inc.,* 108 F.3d 1319 (10th Cir.1997); *Tynall v. National Education Centers, Inc.,* 31 F.3d 209 (4th Cir.1994); *Hilburn* v. *Murata Electronics North America, Inc.,* 181 F.3d 1220 (11th Cir. 1999). Likewise, cases addressing long term disability insurance benefits find that chronic medical absences are a legitimate basis for disability, and that insurers err when they fail to take absenteeism into account. *Katzenberg v. First Fortis Life Ins. Co.,* 500 F.Supp.2d 177, 195 -196 (E.D.N.Y. 2007) (summary judgment denied to insurer when CEO would be unable to effectively perform his job due to frequent medically necessary absences); *Nicolas v. MCI Health and Welfare Plan No. 501,* 2008 WL 4533728, 3 -5 (E.D. Tex. 2008).

Ms. Hughes' frequent and intrusive vertigo episodes and headaches are incompatible with any competitive work schedule.  The entire thrust of her administrative appeal, and of her claim generally, is that *sometimes* she is able to be active, but she is frequently and unpredictably totally incapacitated from any productive activity. (Exhs. A and B).   This renders her unemployable.

Drs. Cronin and Hoffmann's opinions are based on a substantial body of objective data verifying and quantifying Ms. Hughes's vestibular symptoms. As explained by Dr. Cronin in her attached affidavit:

> Ms. Hughes' case has been supported by consistent, credible symptom complaints, by my own direct observations when she has been symptomatic, and by consistently abnormal objective test results, including: (1) abnormal audiograms (hearing tests), (2) abnormal posturography (an objective balance test), (3) abnormal video electronystagmography (diagnostic test to record involuntary movements of the eye caused by a condition known as nystagmus). It can also be used to diagnose the cause of vertigo, dizziness or balance dysfunction by testing the vestibular system, and (4) abnormal caloric diagnostic testing that show a left vestibular hypofunction.

Exhibit B. [1]  Likewise, Dr. Hoffmann explained:

---

[1] In her attached affidavit (Exhibit B, para. 15-16), Dr. Cronin also explains in greater detail the significance of Ms. Hughes' abnormal posturography:

> By way of example, we can refer to the April 8, 2015, Unilateral Stance Test. (AR1120). This is a universally accepted standardized norm referenced test that measures the person's ability to maintain their balance on one leg (that is important for walking, turning, stair climbing and dressing the lower body). For people in Ms. Hughes' age and size range, she should be able to maintain for 30 seconds. In fact she was unable to maintain her balance for 6 seconds, which is well below the norm. This is recognized as an abnormal result and an objective sign of a balance disorder.

> Likewise, in the section below on the April 15, 2015, test is the test of Mean Center of Gravity Sway Velocity (also AR 1120). Again the tests measures the patient's sway compared to statistical data, and again Ms. Hughes is outside the reference range. Her ability should have been in the graphs presented and her results are outside. Again these tests are testing abnormal compared to a person of her age and size that should be able to maintain. On several of the posturography tests, her center of gravity was back and to the left. Her center should be in the center of the circle within the larger circle and as seen in 11/9/16, she is displaced back and to the left. The definition of balance is being able to maintain the center of the body over the base of support (feet, while standing). This test validates that she is 'off balance 'and not centered. Also on the Weight Bearing test on 9/23/15, she was 'off balance 'to her left by 57%. All of test results continue to validate her balance disorder.

> These and the other tests we do upon re-assessments of the patient's status are objective clinical assessments that are used and respected among peers in the vestibular/otology/neuro-otology medical professionals and did not appear reviewed by

> She had a vestibular test called a VNG, or ENG, electronystagmography, and that showed a 25 percent weakness of her left inner ear. So a difference between the two ears of 20 percent is not considered significant, so a 25 percent difference between the two ears means the left inner ear was not functioning as well.

AR p. 977.

Based on the opinions of her treating specialists, backed by objective tests of balance and vestibular functioning, Ms. Hughes's condition renders her frequently and unpredictably totally incapacitated from *any* productive work capacity.  Therefore, Ms. Hughes cannot sustain *any* competitive work schedule, and is therefore disabled under the terms of the policy.

**II. Under any standard of review, Hartford's reliance on the independent medical examination conducted by Dr. Schiff is unwarranted.**

Hartford's final denial of Ms. Hughes's benefits rests upon giving controlling weight to the report of independent medical examiner Dr. Schiff.  For both procedural and substantive reasons, however, that reliance was unjustified.

*B.   Hartford may not rely on evidence that Ms. Hughes was not given the opportunity to review or rebut.*

Firstly, reliance on Dr. Schiff is procedurally flawed from the outset, as Ms. Hughes was never afforded the opportunity to address or rebut Dr. Schiff's report.  It is well established that Second Circuit requires an insurer to allow the claimant an opportunity to review and rebut the final basis of the denial determination.  *See Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir.1998) (affirming district court's judgment, *based on Grossmuller v. Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am., U.A.W., Local 813*, 715 F.2d 853 (3d Cir.1983),

---

Dr. Schiff by his IME report. The omission of these significant test results is important in the determination of Ms. Hughes medical inner ear pathology.

that "full and fair review" was not provided); *Grossmuller*, 715 F.2d at 857–58 (stating that full and fair review requires that claimant be presented with all relevant evidence and be afforded an opportunity to respond to that evidence).  *See also Cohen v. Metropolitan Life Ins. Co.*, 485 F.Supp.2d 339, 353 (S.D.N.Y.2007) (no full and fair review when insurer relies on reports not provided to plaintiff before final denial); *Solomon v. Metropolitan Life Ins. Co.*, 628 F.Supp.2d 519 (S.D.N.Y. 2009) (same, and awarding benefits as matter of law through date of judgment on this very basis).

Dr. Hoffmann questions whether Dr. Schiff was even the correct specialist for Ms. Hughes's condition:

> I do not feel that a neurologist was the right choice to conduct an examination of Ms. Hughes . . . Most neurologists focus on the central and peripheral nervous systems. Vestibular problems are much more complicated, involving the central nervous system, peripheral nervous system, sight, hearing, and proprioception with the extremities, all in a very complex relationship.

Exhibit A.  She also questioned the testing performed:

> Most neurologists do not perform vestibular testing; they generally do not even possess the equipment to do it.  Dr. Schiff seems to be no different.  The "finger in front of the eye" nystagmus test often leads to false negatives simply because it is not nearly as sensitive as objective, video-goggle based eye measurements . . . Dr. Schiff did not perform any of the tests which actually have been historically abnormal for Ms. Hughes including audiogram, video ENG, or posturography, so he seems to have omitted the most relevant data from his examination.

*Id.*

Dr. Cronin likewise criticized Dr. Schiff's report for similar reasons.  Exhibit B.  She highlighted Ms. Hughes' many abnormal, objective vestibular test results; results that Dr. Schiff neither addressed in his report nor conducted himself.  And Dr. Schiff's  single, crude nystagmus test is prone to false negatives and "says more about the poor quality of his evaluation than it does about Ms. Hughes' consistency of presentation or her ability to work." *Id.*

17

Regardless of the standard of review to be employed here, this Court may consider Ms. Hughes' IME rebuttal evidence on the merits even though it was not in Hartford's claim file. This is only fair since Hartford short-circuited the claim dialogue by refusing to allow Ms. Hughes to engage about Dr. Schiff's report. In *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 296 (2d Cir. 2004), the Second Circuit clarified its rule that a Court may exercise its discretion to consider evidence outside the "administrative record" where there is "good cause" to do so, even where the administrator is vested with discretion.   While the Court rejected a *per se* rule that the mere existence of a conflicted administrator should always constitute "good cause,"  it approved of the lower court's exercise of discretion to find "good case" based on the administrator's failure to maintain adequate procedures for internal or appellate review of claims. The holding supports the notion that serious procedural violations that undermine ERISA's guarantee of full and fair review can, and should, support a finding of good cause to consider the claimant's additional evidence on the merits.

This case presents a compelling case for "good cause" to admit and consider the four affidavits responding to Dr. Schiff.   Hartford's attempt to "sandbag" Ms. Hughes with Dr. Schiff's report and then slam the door on administrative proceeding suggests a process every bit as flawed as that in *Locher* and the other cases discussed therein.  Ms. Hughes respectfully urges the Court to find that "good cause" exists, and to consider her rebuttal evidence on the merits.

Irrespective of whether the Court agrees that, pursuant to *Halo*, this should result in *de novo* review, basic principles of due process must prevent Hartford from denying benefits on the basis of evidence it has deliberately insulated from Plaintiff's scrutiny.  As in *Locher*, based on the totality of evidence including her rebuttal evidence, this Court should consider all of the evidence and award benefits through the date of judgment.

18

*C. Dr. Schiff's opinion is fatally flawed by his failure to review and/or address key evidence before offering his opinion.*

Dr. Schiff's opinion fundamentally accuses Ms. Hughes of inconsistencies based on two days of meaningless surveillance, discussed more fully below, and a single airplane trip to Indiana taken just before Hartford ratcheted up its SIU investigation.  Dr. Schiff's conclusion was clearly reached based on Hartford's omission of key evidence from the materials it sent Dr. Schiff for this IME. Within her appeal Ms. Hughes and her doctors all addressed the surveillance and the Indiana trip in detail. AR pp. 928, 986-987, 945, 953-954.     Dr. Hoffmann and Dr. Cronin explained that Ms. Hughes is *encouraged* to perform the kinds of activities observed on surveillance (dog walking and pulling weeds while seated/kneeling and largely stationary) when her symptoms allow it.  This is actually considered part of her vestibular therapy to challenge the vestibular system by walking and doing other light activities.  (Exh. A). Ms. Hughes and her doctors also confirmed that the trip to Indiana was a disaster that more supported her disability than refuted it; Ms. Hughes was incapacitated by her symptoms and prevented from participating in many of the planned activities on that trip.  *Id.*  Dr. Schiff seems to have jumped to the opposite conclusion - that the trip was somehow evidence of greater functionality - but only based on Hartford's choice to keep him ignorant of important evidence that put the trip in its proper context.

Ms. Hughes' appeal also contained two months' worth of daily symptom diaries documenting that Ms. Hughes had incapacitating symptoms on most days.  AR pp. 1016, 1018. Drs. Hoffman and Cronin both confirm the value of this detailed historical information. (Exhs. A and B).  Moreover, federal courts have recognized the value of detailed symptom diaries in

evaluating the impact of a claimant's symptoms on daily functioning.  *See, e.g., Williams v. Standard Ins. Co.,* Civil Action File No. No. 3:15-cv-00589-HZ. (D. OR. Feb. 22, 2016)(noting, among other things, "consistency of symptom reporting" including headache journals, supporting a finding that defendant's denial was arbitrary and capricious as a matter of law); *Leetzow v. Metro. Life Ins. Co*., 2016 WL 7324092 (C.D. Ca. Dec. 5 2016)(same). In the absence of convincing evidence that Ms. Hughes' is mis-reporting her symptoms and restrictions, Hartford may not arbitrarily disregard evidence like her symptom journals. *See Nord v. Black & Decker,* 538 U.S. at 834, 123, S. Ct. at 1972 ("plan administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

Dr. Schiff's recitation of evidence reviewed *does not include the symptom diaries, Dr. Cronin's or Dr. Hoffman's appeal interviews, or any of Ms. Hughes other appeal evidence*.  The only conclusion to be drawn is that Hartford inexplicably failed to provide any of Ms. Hughes' appeal evidence to Dr. Schiff, thereby engaging in flagrant "cherry picking" of the record, and destroying any hope of Dr. Schiff's review being fair or objective.  "An administrator may, in exercising its discretion, weigh competing evidence, but it may not...cherry-pick the evidence it prefers while ignoring significant evidence to the contrary." *Winkler v. Metro. Life Ins. Co*., 170 Fed. App'x. 167, 168 (2d Cir. 2006).  Dr. Schiff's opinion is fatally flawed by his failure to review and/or address key evidence before offering his opinion. Since Hartford itself is responsible for failing to provide all the evidence to Dr. Schiff, it should forfeit any deference to which it would otherwise be entitled.

Making matters worse, Ms. Hughes tried to hand her appeal documents to Dr. Schiff during the IME and he refused to accept them.  (See Exh. C and Exh. D). As noted by Dr. Cronin and Dr. Hoffmann in their affidavits, there is no reasonable explanation for a doctor refusing to

consider important historical information that sheds light on a patient's condition and functioning. A doctor's deliberate decision to refuse to consider relevant data is powerful evidence of bias, and, as a result, a flawed decision process.

*D. Dr. Schiff is the wrong specialty to consider Ms. Hughes's vestibular disorder.*

The ERISA claims regulations require that "in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(v). *See also, Spears v. Liberty Life Assur. Co. of Boston*, 2015 WL 1505844, at *16 (D. Conn. Mar. 31, 2015). Ms. Hughes has claimed disability principally due to a vestibular disorder; that is, a disorder of the inner ear and involving several other systems working together: sight, touch, and proprioception. However, rather than engaging a neuro-otologist, ENT or other vestibular specialist, Hartford referred Ms. Hughes to a neurologist. In their post-final denial affidavits, Drs. Cronin and Hoffmann both stated that neurology was not the appropriate specialty to evaluate Ms. Hughes condition. But even without those affidavits, the point is apparent.  Dr. Schiff did not conduct any vestibular testing, and seems to fail to appreciate the significance of Ms. Hughes consistently abnormal vestibular objective tests. As noted by Dr. Schiff himself, Ms. Hughes' *neurological* exams had been largely *normal* during the four years that Hartford had already accepted her disability. (AR 828). Why, then, did Hartford choose to send her for a neurological examination? A normal neurological exam adds exactly *zero* new information.  Dr. Schiff was the wrong specialist to address Ms. Hughes's debilitating condition, and Hartford's failure to consult a doctor with the "appropriate training and experience in the

field of medicine involved" is yet another serious violation of full and fair review rendering Hartford's decision indefensible under any standard of review.

*E. Dr. Schiff's opinion is grossly at odds with the remainder of the record.*

As a final point, it bears mentioning that Dr. Schiff's opinion is grossly at odds with the remainder of the record. Literally no other physician of record has regarded Ms. Hughes' vestibular disorder as "questionable"; even Dr. Jares, who performed a file review prior to Hartford's initial termination of benefits recognized it existed, and at least restricted Ms. Hughes to no more than 30 minutes of computer use without a break.  It should be noted that Dr. Schiff restricts Ms. Hughes from contact with hazards and unprotected heights, suggesting an acknowledgement that her vertigo is genuine.  It simply makes no sense to accept her vertigo as genuine for purposes of safety concerns, but disregard it from the perspective of productivity.

The opinion of a doctor from the wrong specialty, who has not been provided and refuses to consider all the evidence, who fails to engage with abnormal objective test results highlighted by the claimant's physicians, and who issues an opinion grossly at odds with the remainder of the record, will almost certainly lead to the wrong conclusion.  Dr. Schiff's report does not deserve any weight here.

**III. Hartford erroneously relies upon brief periods of surveillance footage to determine the credibility of inherently variable symptoms.**

Hartford's termination of benefits and Dr. Schiff's assertion of inconsistencies are based in large part upon their interpretation of surveillance footage.  On April 15, 2016, about 9 hours of surveillance was performed. During this 9-hour period, Ms. Hughes was confined to her home for 8 hours and 45 minutes. The only activity observed during the entire 9-hour surveillance period was a mere 16 minutes during which Ms. Hughes simply walked her dog slowly through

her neighborhood. On April 26, 2016, Hartford once again arranged surreptitious surveillance during which Ms. Hughes was confined to her home for 6 and one half hours. The only activity observed was when Ms. Hughes again walked her dog for about 24 minutes, and performed light gardening (mainly weeding) with assistance from a friend on and off for about two hours.  On the basis of this surveillance, both peer reviewer Dr. Jares and IME Dr. Schiff disputed the opinions of Ms. Hughes' own physicians, and questioned the credibility of her symptoms.  This conclusion is irrational, and contrary to established case law.

Hartford is a habitual, repeat offender when it comes to taking surveillance out of context.  Surveillance is only relevant to the extent that footage contradicts statements made by the claimant or her physician, or if it shows the claimant engaged in activities commensurate with competitive employment.  *See Winter v. Hartford Life and Accident Ins. Co.*, 309 F.Supp.2d 409, 415 (E.D.N.Y. 2004), (finding surveillance video showing plaintiff driving car, doing errands, walking, bending and engaging in activities at a local yard unsubstantial evidence); *Thivierge v. Hartford Life and Accident Ins. Co.*, 2006 U.S Dist. LEXIS 25216, at *31-32 (N.D. Cal. Mar. 28, 2006); *Chan v. Hartford Life Ins. Co.*, 2004 U.S. Dist. LEXIS 17962 (S.D.N.Y. Sept. 8, 2004); *Holler v. Hartford Life & Acc. Ins. Co.*, 2005 U.S. Dist. LEXIS 25099 *2-*3 (S.D.Ohio Oct. 26, 2005*); Brenner v. Hartford Ins. Co.*, 2001 U.S. Dist. LEXIS 2480, *18 (D.Md. Feb. 23, 2001).

To be relevant, surveillance evidence must shed light on the claimant's ability to consistently perform the material duties of any occupation. *Carugati v. The Long Term Disability Plan for Salaried Employees,* 2002 U.S. Dist. Lexis 4774, at 7 (N.D. Ill. March 21, 2002) (holding the surveillance video "does not shed light on [the plaintiffs] ability to function at a full-time job"). "Relying on videotapes showing the plaintiff engaging in activities that are

significantly less taxing than working, when all the other objective evidence of treating physicians and therapists confirms that a plaintiff is totally disabled . . . is an abuse of discretion." *Grosz-Salomonv.PaulRevereLifeIns. Co.,* 1999 U.S. Dist. LEXIS 22753 (C.D. Cal. Feb. 4, 1999) and *Osbun v. Auburn Foundry, Inc.,* 2004 U.S. Dist LEXIS 22050 (N.D. Ind. 2004).

Here, there is nothing in the surveilled activities of Ms. Hughes that would directly correlate with a full-time work schedule; after all, Hartford was only able to obtain 80 minutes of footage over the course of two days.  Nor does any of the footage contradict the statements of Ms. Hughes or her doctors.  On the contrary, her *de minimis* activities exactly match up with the expectations and the recommendations of her physicians.  Reviewing the surveillance report, Dr. Cronin stated:

> No. She felt well enough maybe to do that for a little bit at a time. And we do encourage her to do as much as she can because otherwise everything else, such as her muscles, joints, heart, everything's going to get off if you're not doing much movement. We encourage her to move when she feels like it . . .
>
> I don't see any inconsistencies. That doesn't jump at me like oh, my gosh. You know, 1didn't know she was doing that. You know, she's very honest with us about what she does. And, she kind of gets excited if she'd have a day where she can do a little bit more. You know, that we want her to move around, because this can be very kind of depressing condition, too, if you're feeling bad all the time and feel like you can't do anything.

AR p. 954-55.

Likewise, Dr. Hoffmann in her attached affidavit notes that walking and other activities are *encouraged* as a form of vestibular therapy because it challenges the vestibular system. (Exhibit A):

> The nature of the vestibular symptoms is that they are episodic – a patient could be feeling fine one day and the next day develop spinning vertigo so bad it causes the patient to have dry heaves on the bathroom floor.

> An injury to the vestibular system causes patients to be very slow to compensate. Oftentimes the more active they are, thereby challenging the balance system, the better they recover.  Therefore we encourage our patients to increase their activity.  We *want* them to walk because it is very good balance therapy.  We also encourage patients, including Ms. Hughes, to increase other forms of activity. In short, walking her dog and doing light gardening could be viewed as her being a compliant patient.  I vehemently disagree with Dr. Schiff that this is any way "inconsistent" with her claimed symptoms or her disability.  I addressed that very topic in my 2017 interview with Mr. Warncke.
>
> Unfortunately, Dr. Schiff seems not to have reviewed my interview or any of the information that Ms. Hughes brought to the IME with her, insofar is none of that information is recited in his extensive recitation of information reviewed.

(Exhibit A, para. 15-17).  Both Dr. Cronin and Dr. Hoffmann agree that Ms. Hughes's symptoms are intermittent, and that the activity observed on surveillance is not inconsistent with what she can accomplish on good days.  Hartford's brief periods of surveillance footage merely establish that she is a compliant patient.  They do not in any way undermine that Ms. Hughes' symptoms frequently and unpredictably incapacitate her.

**IV. Hartford erroneously terminates benefits in the absence of any evidence of improvement.**

It is important to note that this is not a case in which Hartford continually and from the outset denied Ms. Hughes' disability.  Rather, Hartford agreed that Ms. Hughes was unable to perform her own or alternate occupations and was disabled, and paid benefits for several years, before terminating her benefits.

The Eleventh Circuit has held in *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001), that after an individual establishes disability, the Plan Administrator must show evidence of improvement before terminating benefits.  "Because Levinson satisfied his obligations under the terms of the plan, Reliance had to produce evidence showing that Levinson was no longer disabled in order to terminate his benefits."  *Id.*

Similarly, the Eighth Circuit explained in *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586 (8th Cir. 2002) that "in determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them."  *McOsker*, 279 F.3d at 590.  The *McOsker* court stated:

> We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.

*Id.* at 589.  *See also Walke v. Group Long Term Disability Insurance*, 256 F.3d 835, 840 (8th Cir. 2001) (overturning plan administrators' termination of benefits where nothing in the record demonstrates medical improvement or change in circumstances to warrant termination of benefits insurer initially granted).

Here, there is no evidence that Ms. Hughes has experienced any sustained medical improvement. To the contrary, the evidence of her disability is essentially the same as when Hartford approved benefits:  her physicians continue to assert she is disabled due to intermittent but severe episodes of vertigo and headache; her physicians state affirmatively that her condition has not improved in a manner that would allow her to return to the workforce; and her physicians cite to the same objective evidence from nystagmogram and posturography that has underpinned Ms. Hughes' disability claim from the beginning.  In the absence of any outward change in her medical condition, or any change in the proof of disability she has presented, Hartford's decision to terminate benefits must be viewed skeptically.

**Conclusion**

For all the foregoing reasons, Hartford's decision is erroneous under any legal standard. It ultimately relies upon the opinion of an independent medical examiner who failed to review all the relevant evidence, failed to grapple with objective test results highlighted by Ms. Hughes' physicians, and whose report was unfairly shielded from any opportunity for rebuttal from Ms. Hughes or her physicians.  That Hartford irrationally interprets surveillance to evaluate intermittent symptoms, and terminates benefits in the absence of any medical improvement, only compounds the error.  The termination of benefits should be reversed, with benefits reinstated, or and the very least remanded to consider the rebuttal evidence Hartford evaded in the first instance.

Respectfully submitted, this the 22nd day of June, 2018.


/s/ Jeffrey S. Warncke
Georgia Bar No. 737850
Pro Hac Vice No.: phv09385


Evans Scholz Williams & Warncke, LLC
3490 Piedmont Road, N.E., Suite 1200
Atlanta, Georgia  30305
T: 404.841.9400
F: 888.738.5949
E: jswarncke@esww-law.com




**CERTIFICATE OF TYPE SIZE COMPLIANCE**

The foregoing pleading is prepared in Times New Roman, 12 point, in accordance with applicable rules.

Respectfully submitted, this the 22<u>nd</u> day of June, 2018.


                                        /s/ Jeffrey S. Warncke
                                        Jeffrey S. Warncke

## **CERTIFICATE OF SERVICE**

I hereby certify that on **June 22, 2018,** a copy of the foregoing document was filed electronically and served by U.S. Mail to all counsel, as below.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Gregory J. Bennici
Patrick W. Begos
*Attorneys for Defendant*
Robinson & Cole, LLP
1055 Washington Boulevard
Stamford, CT  06901
E:  gbennici@rc.com
E:  pbegos@rc.com

*/s/ Jeffrey S. Warncke*
Jeffrey S. Warncke
GA State Bar No.:  737850
(Pro Hac Vice No.: phv09385)
*Attorney for Plaintiff*
Evans, Scholz, Williams & Warncke
3490 Piedmont Road NE, Suite 1200
Atlanta, GA  30305
P:  404.841.9400
F:  888.738.5949
E:  jswarncke@esww-law.com

29