## PATRICIA HUGHES V. THE HARTFORD

In the United States District Court
District of Connecticut

Civil Action File No.: 3:17-cv-01561-JAM

### AFFIDAVIT OF DR. KAREN HOFFMANN

Jeffrey S. Warncke, Esq.
Evans, Scholz, Williams & Warncke
3490 Piedmont Road, NE, Suite 1200
Atlanta, GA 30305-4810
P: 404.841.9400
F: 888.738.5949
jswarncke@esww-law.com



PLAINTIFF'S
EXHIBIT
"A"

Blumberg No. 5113

# AFFIDAVIT OF KAREN HOFFMANN, MD

1. My name is Karen Hoffmann, MD. I am over the age of 18 and legally competent to give this affidavit. The facts recited herein are based on personal knowledge.

2. I am providing this affidavit at the request of Patricia Hughes' attorney, Jeffrey S. Warncke, in response to the Independent Medical Examination (IME) report prepared by Dr. Arthur Schiff, who examined Patricia Hughes on May 11, 2017.

3. Until Mr. Warncke provided me Dr. Schiff's report, I was never provided a copy or afforded an opportunity to respond. If I had been given the opportunity in 2017, this affidavit contains what my response would have been.

4. I am a medical doctor specializing in Neurotology. I am board certified in Otolaryngology, Head and Neck Surgery, and have had additional fellowship training in Otology and Neurotology, including training in evaluating and treating people with vestibular problems and hearing loss. Treating vestibular and balance disorders has been a focus of my practice for 15 years.

5. Dr. Schiff's report seems to focus on Ms. Hughes' functioning from a neurological perspective, which is perhaps to be expected since Dr. Schiff is a Neurologist. He did perform a neurologic examination but did not perform vestibular testing such as VNG, joint range of motion, eye-head coordination, assessment of the vestibular ocular reflex, postural control, posturography, or Dix-Hallpike testing.

6. It appears that Dr. Schiff reviewed some of Ms. Hughes' previous records, interviewed the patient, looked at her medications, and then watched a surveillance tape of Ms. Hughes' activities.

7. Dr. Schiff evaluated Ms. Hughes' balance with basic gait testing and Romberg. Dr. Schiff's notation of normal gait is consistent with my treatment of Ms. Hughes at times. Her gait is sometimes normal (or very close to normal) and sometimes abnormal, based on the prevalence of her symptoms on the day. Oftentimes she walks with an abnormally wide stance, which is common with people with balance problems.

8. I do not feel that a neurologist was the right choice to conduct an examination of Ms. Hughes. While her migraine syndrome is arguably within the field of Neurology, it is secondary to her vestibular problems that were the primary cause of her disequilibrium and imbalance, and therefore, her disability. Her vestibular function could be impacted by vestibular migraines, worsening her balance.

9. A normal neurological examination does not exclude the possibility of peripheral vestibular dysfunction.

10. Most neurologists focus on the central nervous systems. Balance problems are complicated, involving the central nervous system, peripheral nervous system, sight, and proprioception of the extremities, all in a very complex relationship. This is beyond what most neurologists specialize in.

11. Most neurologists do not perform vestibular testing; they generally do not even possess the equipment to do it. The "finger in front of the eye" nystagmus test may lead to false negatives simply because it is not nearly as sensitive as objective, video-goggle based eye measurements.

12. Dr. Schiff did not perform any of the tests which actually have been historically abnormal for Ms. Hughes including audiogram, video ENG, or posturography, so he seems to have omitted the most relevant data from his examination.

13. In 2017 I had already considered the degree of activity reported on the video surveillance that Dr. Schiff relied upon to conclude some "inconsistency" on Ms. Hughes' part. In 2017, I provided a lengthy interview with Mr. Warncke in which I explained that Ms. Hughes' ability to walk her dog or kneel down and pull weeds is expected and encourage when she is less symptomatic. It does not prove she is exaggerating her symptoms nor that she was capable of working.

14. The nature of the vestibular symptoms is that they are episodic – a patient could be feeling fine one day and the next day develop rotary vertigo so bad it causes the patient to hold onto the wall to walk.

15. Patients may be slow to compensate after an injury to the vestibular system. Oftentimes the more active they are, thereby challenging the balance system, the better they recover. Therefore we encourage our patients to increase their activity. We *want* them to walk because it is very good balance therapy. We also encourage patients, including Ms. Hughes, to increase other forms of physical activity. In short, walking her dog and doing light gardening could be viewed as her being a compliant patient. I strongly disagree with Dr. Schiff that this is any way "inconsistent" with her claimed symptoms or her disability.

16. I addressed that very topic in my 2017 interview with Mr. Warncke. Unfortunately, Dr. Schiff seems not to have reviewed my interview or any of the information that Ms. Hughes brought to the IME with her, insofar as none of that information is recited in his extensive recitation of information reviewed. I have been advised that Ms. Hughes brought my interview transcript, two months' worth of symptom logs, an interview from her vestibular therapist Gaye Cronin, and other important information and presented it to Dr. Schiff. If it is true that Dr. Schiff refused this information, I find this troubling. In any kind of fair and objective evaluation, the expert should want to see all of the available information about the patient's condition, including any updated information not previously available. History is especially important in evaluation of any vestibular disorder, as the diagnosis is often made clinically, based on a patient's signs and symptoms.

17. I have also been advised that Dr. Schiff refused to consider information explaining that when Patricia Hughes went to Indiana she had to be wheeled through the airport as she could not walk by herself. The trip on both ends provoked her symptoms so that she had rotary vertigo to the point of nausea. For the better part of two days after her flight on

both ends, she was incapacitated. Again, if true, this is important information contributing to a *complete* history.

18. Ms. Hughes' daily symptom logs also provide invaluable data. They establish a pattern of symptoms which may help to clarify the nature and severity of her vestibular symptoms and to evaluate the degree of ability to function. Again, patient history is extremely important in diagnosing and managing vestibular conditions.

19. Dr. Schiff, *possibly* based on an incomplete clinical history, seems to have concluded Ms. Hughes has exaggerated the severity of her symptoms and the effect on her functioning. In years of treating Ms. Hughes, I have never found any reason to suspect she was being anything other than sincere and working hard to overcome her health problems. Dr. Schiff's opinions about "inconsistency" in my view are contrary to the overall medical evidence regarding the patient's vestibular function.

20. It remains my opinion that Ms. Hughes' vestibular symptoms are too frequent and too severe to allow her to be a reliably productive employee in any work setting, no matter how light. Her symptoms would become all that much more frequent and severe if she were unable to manage her surroundings and was subjected to bright lights and visual motion from people around her and/or scanning a computer screen. These are common triggers for vestibular symptoms and common to most modern work places.

FURTHER AFFIANT SAYETH NOT.

_____
Karen Hoffmann, MD

Date: _____6/19/18_____