# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PATRICIA HUGHES, <br> *Plaintiff,* <br><br> v. <br><br> HARTFORD LIFE AND ACCIDENT INSURANCE CO. <br> *Defendant.* | No. 3:17-cv-1561 (JAM) |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is an ERISA case about what it means for an insurance company to give a "full and fair" review of a claim for disability benefits. The defendant insurance company terminated plaintiff's disability benefits, once on an initial review and then again after plaintiff filed for an internal appeal review. But while the internal appeal was pending, the insurance company hired a doctor to examine plaintiff, and the doctor then sent the insurance company a report of his findings. Despite plaintiff's request, the insurance company did not give plaintiff a copy of the doctor's report, much less allow plaintiff to respond to the report. The company then denied plaintiff's appeal, while relying heavily on the doctor's report to do so.

In similar factual contexts, federal courts nationwide have split on the issue of whether an ERISA plan or administrator may procure new medical evidence while it is considering a claimant's appeal and then in turn use that evidence to deny the appeal without first allowing the claimant to see or try to rebut it. The Second Circuit has yet to decide this issue.

Based on my review of the somewhat complicated regulation that governs here as well as the precedent on both sides, I am left persuaded that the defendant insurance company denied plaintiff a full and fair review. Accordingly, I will grant plaintiff's motion for summary judgment and remand the case to the defendant insurance company to conduct a full and fair review.

**BACKGROUND**

Plaintiff Patricia Hughes is a registered nurse who worked at Children's Healthcare of

Atlanta. Doc. #50-1 at 3. Beginning in January 2011, she was treated by a specialist, Dr. Karen

Hoffman, for vertigo and Meniere's disease (an inner ear disorder causing vertigo). *Ibid.*

Hughes's condition progressively worsened as documented by Dr. Hoffman until late 2012,

when she suffered constant dizziness and disequilibrium and was reported as unable to walk,

drive, or work. *Id.* at 3-4.

Defendant Hartford Life and Accident Insurance Company administers and insures the

disability benefit plan under which Hughes received coverage through her employer. *Id.* at 2.

Hartford Life approved Hughes's claim for disability and began paying benefits as of November

2012. *Id.* at 4.

Hughes briefly returned to part-time work (two hours per day) in early 2013 but stopped

by March 2013. She continued to experience setbacks including multiple migraine headaches for

which she saw numerous medical specialists through 2013 and 2014. *Id.* at 5-8. In 2014, she got

into two car accidents when she drove into the cars in front of her. Her doctors attributed the

accidents to insomnia and vertigo. *Ibid.* That same year, she reported to Hartford Life that her

headaches had decreased to approximately three per month. *Ibid.*

Hartford Life decided to engage in covert video surveillance of Hughes in April 2016.

She was seen walking her dog, engaging in yard work, and gardening for about an hour. *Id.* at 8-

9. Hartford Life then interviewed Hughes in May 2016, and it forwarded the surveillance footage

to Dr. Hoffman to seek a further opinion. Hartford Life also consulted Hughes's neurologist,

psychiatrist, chiropractor, and vestibular therapist, and it sent the footage and Hughes's file to the

Medical Consultants Network for an independent medical evaluation, which was conducted by neurologist Joseph Jares. *Id.* at 10-13; Doc. #39-10 at 3-12.

When asked if Hughes was capable of "activity for 40 hours a week: primarily seated with some standing/walking throughout the day," along with some carrying limitations and the opportunity to change positions as needed, Dr. Hoffman responded that she was. However, she noted that Hughes "will not be able to drive when she is having vertigo," and that reading and using the computer for long periods of time continue to cause "disequilibrium and dizziness." Doc. #50-1 at 11.

Dr. Hoffman later clarified her response in an interview with Hughes's attorney, which was submitted to Hartford Life on appeal. Dr. Hoffman stated that while she had noted some improvement in Hughes's condition in 2016, she "didn't feel that [Hughes] was able to improve enough to go back to work." Doc. #39-6 at 115.

Hartford Life asked Hughes's other providers if they recommended any activity limitations stemming from the conditions they were treating. Doc. #39-2 at 6; Doc. #39-10 at 64-75. Hughes's neurologist checked the "no" box in response, adding that Hughes "can't bend over frequently" and needs breaks throughout the day. Doc. #50-1 at 12. Her psychiatrist also checked "no" and added that Hughes is "physically limited and secondarily limited" by the depression that stems from her physical problems. *Id.* at 13. Her chiropractor did not suggest any activity limitations, but he noted that he had not seen her in several months. *Ibid.* Her vestibular therapist checked "yes," noting that Hughes required the following limitations: "limited reaching, turning, lifting/carrying, head movements, bending, climbing, balancing, eye movements, pushing/pulling, walking on uneven surfaces, operating machinery." *Ibid.*

Hartford Life interviewed Hughes on May 12, 2016. *Id.* at 10; Doc. #39-10 at 33-36. According to the interviewer's notes, Hughes reported being able to shop at a large store, though she said that the noise sometimes exacerbates her symptoms and that her partner usually accompanies her to the store. She said she could walk up and down stairs but only at a slow pace using the rail. She reported traveling from Georgia to Indiana for a family event but said the noise and movement in the airport caused her symptoms to resurface, requiring the use of a wheelchair. She said she believed she would "be able to return to work at some time." *Id.* at 35.

Dr. Jares also issued a report. He did not dispute that Hughes suffered from a vestibular disorder, but he stated that, based on his observation of the surveillance footage, "she could sit without restriction; stand and walk for up to an hour per day; and use a computer for up to eight hours a day, but for no more than thirty minutes at a time with a two-to-three minute break." Doc. #50-1 at 13-15.

Hartford Life terminated Hughes's benefits on October 6, 2016. *Id.* at 16. The letter stated that "[w]e have completed our review of your claim for benefits and have determined that you do not meet the policy definition of Disability beyond 10/05/2016." Doc. #39-4 at 74. It further advised that "the Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review." *Id.* at 78. The letter also stated that "[y]ou are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records[,] and other information relevant to your claim." *Ibid.*

On March 28, 2017, Hughes filed an administrative appeal of the decision, arguing that Hartford Life had misconstrued her medical records and the surveillance footage and fundamentally misunderstood the nature of her disability. She wrote that her symptoms "frequently and unpredictably render her incapable of any productive activity, at work or at

home," such that "it is impossible for her to reliably and consistently perform the tasks required of any full-time employee." Doc. #39-6 at 126. While on some days she can engage in activities like walking her dog, gardening, or reading, on bad days she has "no tolerance for any activities and may be in bed all day." *Id.* at 61-62.

The appeals unit at Hartford Life forwarded almost all of the records in her file to the Medical Consultants Network for an independent medical evaluation, with directions for the reviewer to "comment on [Hughes's] overall functionality" and to consider her objective complaints, "the impact of her medications on her ability to function in the workplace," and her ability to sustain work on a consistent basis. Doc. #39-4 at 62. Dr. Arthur Schiff, a neurologist, was assigned to the case.

On April 25, 2017, Hartford Life wrote a letter to Hughes advising her that it had scheduled an appointment for her to be examined by Dr. Schiff on May 11, 2017. Doc. #39-5 at 434. The letter advised that Dr. Schiff would send a report of his examination to Hartford Life. *Ibid.*

After examining Hughes and reviewing her file, Dr. Schiff sent a report to Hartford Life on May 23, 2017. Doc. #39-5 at 425. On the basis of various neurological tests, Dr. Schiff concluded that the results were normal. He concluded that Hughes suffered from tinnitus, dizziness, and giddiness, and that her diagnosis of vestibular dysfunction was inconsistent with the normal results of her neurological examinations and the physical movements observed in person and in the surveillance footage. Doc. #50-1 at 21; Doc. #39-5 at 431.

Hughes asked Hartford Life for a copy of Dr. Schiff's report so that she could respond to it before Hartford Life ruled on her claim. Doc. #41-2 at 2. But Hartford Life did not send her the report. Hughes asked again, and still Hartford Life did not send it. *Ibid.*

Hartford Life then denied Hughes's appeal on June 29, 2017. The appeal denial letter devoted seven paragraphs to Dr. Schiff's report and repeatedly used it to refute Hughes's statements, such as her claim that turning her head side-to-side exacerbates her vertigo and that her migraines interfere with her ability to work. Doc. #39-4 at 62-63. Only after denying her appeal did Hartford Life give Hughes a copy of Dr. Schiff's report. Doc. #41-2 at 3.

Hughes then filed an appeal to this Court pursuant to ERISA, 29 U.S.C. § 1001 *et seq*. The parties have cross-moved for summary judgment. They have agreed to my consideration of the Administrative Record but disagree about whether I may consider four post-appeal rebuttal affidavits that Hughes has submitted in response to Dr. Schiff's report. Doc. #54; *see also* Docs. #41-4 through 41-7 (copies of the affidavits). It is Hartford Life's position that the Court should not consider these affidavits because they are not part of the administrative record. Doc. #49 at 19.

The affidavits are from Hughes herself, her long-time partner, her doctor, and her occupational therapist. Dr. Hoffman, who had treated Hughes since 2011, Doc. #50-1 at 3, states in her affidavit that the "inconsistencies" that Schiff noted in his report reflect precisely the variability in function she would expect from a patient with a serious vestibular disorder, Doc. #41-4 at 3. "The nature of the vestibular symptoms is that they are episodic—a patient could be feeling fine one day and the next day develop rotary vertigo so bad it causes the patient to hold onto the wall to walk." *Ibid*. She states that a neurologist not trained in vestibular disorders was the wrong specialist to conduct the review, and that "Dr. Schiff did not perform any of the tests which actually have been historically abnormal for Ms. Hughes including audiogram, video ENG, or posturography, so he seems to have omitted the most relevant data from his examination." *Ibid*. She concludes that "it remains my opinion that Ms. Hughes's vestibular

symptoms are too frequent and too severe to allow her to be a reliably productive employee in any work setting, no matter how light," and that working would exacerbate Hughes's already debilitating symptoms. *Id.* at 4.

Hughes's partner, Jeannie Johnson, was present during Dr. Schiff's examination. She states in her affidavit that the exam appeared "very elementary," "limited," and "rushed," compared to examinations she has observed over the course of her career as a nurse. Doc. #41-7 at 2.

The affidavit of Gaye Cronin, Hughes's vestibular therapist, echoes Dr. Hoffman's statement that Dr. Schiff failed to conduct many tests that she would expect of a comprehensive examination of someone with Hughes's symptoms and that have consistently yielded abnormal results from Hughes in the past. Doc. #41-5 at 4-7. "The entire picture is consistent," she states, referring to Hughes's disability. *Id.* at 8. "For the last several years Ms. Hughes's symptoms have been so frequent and unpredictable as to prevent even reliable part time work." *Id.* at 9. A job requiring transportation, exposure to movement, bright lighting, or computers would likely cause Hughes's "episodes of incapacitation [to be] much more frequent and severe." *Ibid.*

Hughes alleges that, had Hartford Life disclosed Dr. Schiff's report before making a final decision on the appeal, Hughes would have been able to submit these rebuttal affidavits for consideration as part of the appeal. Doc. #41-2 at 3; Doc. #41-4 at 2 (affidavit of Dr. Hoffman, stating that "if I had been given the opportunity in 2017 [to review and respond to Dr. Schiff's report], this affidavit contains what my response would have been").

## DISCUSSION

"Congress enacted ERISA 'to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits.'" *Halo v. Yale Health Plan*, 819 F.3d 42, 47-48 (2d Cir. 2016) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489

U.S. 101, 113 (1989)). As the Second Circuit has noted, a "key component" of ERISA's regulatory framework is its procedural requirements that govern how an ERISA plan processes claims for health and disability benefits. *Id.* at 48. Most significantly for present purposes, this includes a requirement that every ERISA plan "'afford a reasonable opportunity to any participant whose claim for benefits has been denied for *a full and fair review* by the appropriate named fiduciary of the decision denying the claim.'" *Ibid* (quoting 29 U.S.C. § 1133) (emphasis added).

In the ordinary course, a claim for benefits proceeds through at least a two-step process of administrative review by an ERISA plan or its claims administrator. First, the claim is subject to an initial determination whether to grant or deny the claim, and then—if the claim has been denied—the claimant may file an internal appeal for the plan to consider again whether the claim should be granted or denied. If the internal appeal results in a denial of benefits, then an ERISA claimant may bring a court action to review the plan's denial. *See* 29 U.S.C. § 1132(a)(1)(B).

To the extent that the plan's denial of a claim is based on its exercise of a discretionary judgment, a court will review the plan's decision under an abuse-of-discretion standard, which is consistent with the law's recognition that an ERISA plan and its claim administrator stand in a fiduciary position of trust with respect to a claimant for benefits. *See Halo*, 819 F.3d at 51. On the other hand, if a plan fails to comply with the required ERISA procedures for how it must process a claim, then a court instead will apply *de novo* review to the plan's denial of benefits unless the plan can prove that its procedural violation was inadvertent and harmless. *See id.* at 57-58; *see also In re DeRogatis*, 904 F.3d 174, 187 (2d Cir. 2018).

That brings me to the argument by Hughes in this case. Hughes argues that Hartford Life denied her the right to a full and fair review of her claim because it did not allow her to see or

respond to Dr. Schiff's report before denying her appeal. To address this argument, it is necessary to say much more about the federal regulation—29 C.F.R. § 2560.503-1—that governs what procedures a plan must follow when adjudicating a claim.

The version of this regulation that applied to Hughes's claim became effective in 2001. *See* Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,246, 2000 WL 1723740 (Nov. 21, 2000). In some detail it specifies minimum procedural requirements that an ERISA plan must follow at every stage of the claims process—including the plan's process for the filing and processing of a claim (§ 2560.503-1(b)(3)), the timing of the plan's notification to the claimant of its initial benefit determination (§ 2560.503-1(f)), the manner and content of the plan's notification of the decision (§ 2560.503-1(g)), the claimant's administrative appeal of an adverse benefit determination (§ 2560.503-1(h)), the timing and notification of the plan's benefit determination on appeal review (§ 2560.503-1(i)), and the manner and content of the plan's notification to the claimant of its benefit determination on review (§ 2560.503-1(j)).

The focus of Hughes's argument is on the requirements that govern how the plan must consider a claimant's appeal after the plan has initially denied benefits. *See* § 2560.503-1(h). As noted above, Congress by statute requires that such an internal appeal include a "full and fair" review by the plan. *See* 29 U.S.C. § 1133. The regulation echoes this requirement: "Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination." § 2560.503-1(h)(1).

Just what does it mean to have a full and fair review? As multiple courts have explained, the "persistent core requirements" of full and fair review include "knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of that evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision." *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) (quoting *Grossmuller v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers*, 715 F.2d 853, 858 n.5 (3d Cir. 1983)); *see also Shakhnes v. Berlin*, 689 F.3d 244, 256 n.8 (2d Cir. 2012) (same).

Beyond this general and sweeping mandate that the plan must conduct a full and fair review, the regulation goes on to detail specific minimum safeguards to "provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination." § 2560.503-1(h)(2). As relevant here, the regulation creates three related rights for a claimant during the appeal process.

First, a claimant has a *right to submit information to the plan* for consideration on appeal. A plan must "[p]rovide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits." § 2560.503-1(h)(2)(ii). Thus, unlike a conventional court appeal, an administrative appeal under ERISA presupposes the right of the claimant to expand the record with additional information for the plan to consider before it decides the appeal.

Second, a claimant has *a right of access to obtain information from the plan* at the appeal stage that is relevant to the claim for benefits. A plan must "[p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." § 2560.503-

1(h)(2)(iii). The regulation then cross-references a separate regulatory definition of what documents are "relevant" to a claim for benefits. In pertinent part, that definition provides that "[a] document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information (i) [w]as relied upon in making the benefit determination; [or] (ii) [w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; . . . ." § 2560.503-1(m)(8).

Third, a claimant has *a right for the plan to take into account the information submitted by the claimant* at the appeal stage. A plan must "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." § 2560.503-1(h)(2)(iv).

These three rights—the right of the claimant to submit new information, the right of the claimant to have access to relevant information in the possession of the plan, and the right of the claimant to have the plan actually take account of information that the claimant submits—are all essential components of what the regulation defines to be a full and fair review. And in light of these rights, it is evident to me that Hartford Life denied Hughes a full and fair review when it denied Hughes the right to see and respond to the report of Dr. Schiff prior to deciding her appeal.

Most significantly, when Hartford Life denied Hughes the right to a copy of Dr. Schiff's report, it denied Hughes her regulatory right of access to information that was plainly relevant to her claim. § 2560.503-1(h)(2)(iii). There can be no dispute that the Schiff report mattered,

because Hartford Life relied on it extensively as part of its grounds to deny the claim for continuing disability benefits. Doc. #39-4 at 62-63.

Hartford Life argues that this pending-appeal right of access to relevant information under § 2560.503-1(h)(2)(iii) includes only information that is relevant to the plan's initial denial of the claim, but not information that is relevant to the plan's determination of the claim on appeal. Doc. #68 at 4-5. As Hartford Life notes, the regulation specifically defines what information is "relevant," and it defines "relevant" information to extend only to information that was either "relied upon *in making the benefit determination*" or "submitted, considered, or generated in the course of *making the benefit determination*, without regard to whether such document, record, or other information was relied upon in *making the benefit determination*." 2560.503-1(m)(8)(i)-(ii) (emphasis added). According to Hartford Life, these words limit the scope of what is "relevant" solely to documents that were part of the initial "benefit determination" rather than part of the appeal review.

I do not agree. In my view, it is artificial to suggest that the only part of the claims procedure process that constitutes a "benefit determination" is what the plan initially decides when presented with a claim but not what the plan decides on appeal. Indeed, if the appeal of an initial claim denial were not part of a "benefit determination" process, then it makes no sense why the regulation confers a right for the claimant to submit new evidence and information at the appeal stage and confers a right for the claimant to have this new evidence and information taken into account on appeal. *See* § 2560.503-1(h)(2)(ii) & (iv). Why allow all this new information and consideration if the appeal is not part-and-parcel of a "benefit determination"?

True enough, the regulation itself does not furnish a helpful definition of the term "benefit determination."[1] But other provisions of the regulation use the term "benefit determination" in a manner that makes clear that a "benefit determination" does not occur *solely* at the time of an initial claim decision but also occurs progressively upon the determination of any appeal. For example, subsection (i) of the regulation is titled: "Timing of notification of benefit determination on review"—a title that presupposes that there is indeed a "benefit determination" that occurs "on review." § 2560.503-1(i); *see also* § 2560.503-1(i)(3) (incorporating this provision for disability claims).

The same provision of the regulation goes on to set a 60-day deadline for when a plan must notify a claimant of "*the plan's benefit determination on review*." § 2560.503-1(i)(1)(i) (emphasis added). This notification deadline is subject to extension if "special circumstances . . . require an extension of time *for processing the claim*," *ibid.* (emphasis added), thereby making clear that the appeal itself is part of the overall claim process. And the regulation describes how in cases where the plan has a "committee or board of trustees designated as the appropriate named fiduciary" that holds meetings only occasionally to consider appeals from initial denials of benefits, then "the appropriate named fiduciary shall instead *make a benefit determination* no later than the date of the meeting of the committee or board that immediately follows the plan's receipt of a request for review." § 2560.503-1(i)(1)(ii) (emphasis added); § 2560.503-1(i)(3)(ii) (same). This language makes clear that it is the appellate committee or board that itself "make[s] a benefit determination."

---

[1] The regulation has a "definitions" section that defines the term "adverse benefit determination." § 2560.503-1(m)(4). I will not recite the entire lengthy definition here except to note that its focus is on fleshing out what types of plan decisions constitute an "adverse" action rather than what type of action constitutes a "benefit determination" or "determination" in the first instance. This definitional provision has nothing to say about whether the term "benefit determination" has some artificial temporal scope that is limited solely to the initial decision on a claim rather than a decision on appeal.

If circumstances warrant yet "a further extension of time for processing, *a benefit determination shall be rendered* not later than the third meeting of the committee or board following the plan's receipt of the request for review." § 2560.503-1(i)(1)(ii) (emphasis added); § 2560.503-1(i)(3)(ii) (same). Then "[t]he plan administrator shall notify the claimant . . . *of the benefit determination* as soon as possible, but not later than 5 days *after the benefit determination is made*." § 2560.503-1(i)(1)(ii) (emphasis added); § 2560.503-1(i)(3)(ii) (same).

As all of these provisions make mind-numbingly clear, the regulation does not adopt a temporally truncated interpretation of the term "benefit determination" to mean solely the initial claim decision.[2] The regulation recognizes the administrative appeal process as part of the overall claim process and "benefit determination." There is no other sense to be made of the regulation's repeated references to the power of the plan or fiduciary on appeal review to make a "benefit determination."

If Hartford Life's interpretation were correct, then the regulation could just as well have said "initial benefit determination" (instead of simply "benefit determination") when it defined what documents are "relevant" and must be disclosed. But it does not say that.

For that matter, the Department of Labor knew how to use the term "*initial* benefit determination" when it drafted the regulation. It used that very term when it described the right of a claimant to have his or her submissions on appeal given consideration by the plan. *See* §

---

[2] Indeed, I have listed but a few examples. Subsection (i) of the regulation is otherwise replete with more references to the term "benefit determination" that make clear the drafter's understanding that the determination that a plan makes on appeal from an initial denial of a claim is part-and-parcel of the "benefit determination." *See* § 2560.503-1(i)(1)(ii) (providing that, if it is necessary for the plant to extend the time to consider an appeal, the "[t]he plan administration shall notify the claimant … *of the benefit determination* as soon as possible") (emphasis added); § 2560.503-1(i)(2)(i) (providing that for cases of "urgent care" that "the plan administrator shall notify the claimant … of *the plan's benefit determination* on review as soon as possible"). Subsection (j) of the regulation (which governs the manner and content of a plan's notification to a claimant of its decision on appeal) is similarly saturated with the use of the term "benefit determination" in a manner that defies any suggestion that the term is meant to be limited solely to whatever decision has been made upon initial claim review but not a decision on appeal. *See* § 2560.503-1(j).

2560.503-1(h)(2)(iv) (plan must consider information on appeal "without regard to whether such information was submitted or considered in the initial benefit determination").

But the regulation does not use the term "initial benefit determination" when defining the scope of documents that are "relevant" and therefore subject to disclosure upon a claimant's request during the pendency of an appeal. The regulation "requires a plan to disclose documents used in making the 'benefit determination,'" and "[t]he regulation's plain language . . . is not narrowly confined to the *initial* benefit determination, . . . but rather requires ERISA plans to disclose relevant documents during any phase of the 'benefit determination,' including at the appeal level." *Lammers v. Am. Express Long Term Disability Benefit Plan*, 2007 WL 2247594, at *6 (D. Minn. 2007).

In addition, if Hartford Life were correct that the term "benefit determination" refers solely to "initial benefit determination," then this means that Hartford Life would have no duty to disclose Dr. Schiff's report even after the appeal was decided. The regulation has two sets of disclosure provisions—one is the *pending-appeal* disclosure requirement (§ 2560.503-1(h)(2)(iii)) that I have just discussed, and the other is a *post-appeal* disclosure requirement (§ 2560.503-1(i)(5) & (j)(3)). Both of these disclosure requirements incorporate the identical regulatory definition of what documents and information is "relevant" for disclosure purposes.[3] So if a doctor's report is not "relevant" and disclosable while an appeal is still pending, then it

---

[3] *Compare* § 2560.503-1(h)(2)(iii) (pending-appeal disclosure provision stating that "a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section") *with* § 2560.503-1(i)(5) (post-appeal disclosure provision stating that "[i]n the case of an adverse benefit determination on review, the plan administrator shall provide such access to, and copies of, documents, records, and other information described in paragraphs (j)(3), (j)(4), and (j)(5) of this section as is appropriate"), *and* § 2560.503-1(j)(3) (requiring notification of decision with "[a] statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section").

remains not "relevant" and disclosable even after the appeal is finally decided. Hartford Life's restrictive interpretation would mean that an ERISA plan is free to procure medical reports during the appeal process that need never be disclosed to the claimant—not during the appeal or anytime at all.

Hartford Life also argues that a document does not become "relevant" until "*after* a particular benefit determination has been made." Doc. #68 at 4 (emphasis in original). But the regulation does not say so. The regulation defines the scope of "relevant" documents to include not only those documents that were actually "relied upon in making the benefit determination" but also those that were "submitted, considered, *or generated in the course of making the benefit determination*, without regard to whether such document, record, or other information was relied upon in making the benefit determination; . . . " § 2560.503-1(m)(8). When Dr. Schiff's report was generated for purposes of Hartford Life's making its benefit determination, it fell within the scope of the regulation's definition of "relevant" documents subject to disclosure upon request.

Nor can Hartford Life's restrictive interpretation of the regulation's pending-appeal disclosure provision be squared with the other related rights that Hughes had while her claim was on appeal. As noted above, these additional rights include "the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits," § 2560.503-1(h)(2)(ii), as well as the right to "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." § 2560.503-1(h)(2)(iv).

If Hughes had no right to learn about secret medical reports that Hartford Life procured and relied on to reject her claim (here, the report and conclusions of a doctor for whom Hartford

Life required Hughes to submit to an in-person examination), then her rights during the appeal phase to submit new information and to have this information taken into account by Hartford Life became mostly meaningless. As the Supreme Court long ago explained, "[t]he right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them[,]" and "[t]he right to submit argument implies that opportunity; otherwise the right may be but a barren one." *Morgan v. United States*, 304 U.S. 1, 18, 58 S. Ct. 773, 776 (1938).

No common sense notion of what it means to have a full and fair review can be squared with a review process that denies a claimant access to key information that will be the very basis for a health or disability plan to deny benefits. Full and fair review suggests a review that is thorough, comprehensive, and transparent—not one in which a plan may order up a doctor's report at the final hour and then deny the claimant access to this information until it is too late for the claimant to respond. *See Cohen v. Metro. Life Ins. Co*., 485 F. Supp. 2d 339, 353 (S.D.N.Y. 2007) (plan was arbitrary and capricious because of its "failure to provide notice to Plaintiff of its consideration of materials in addition to those disclosed following its initial denial," which "clearly deprived Plaintiff of the opportunity to submit comments and materials relevant to MetLife's determination" on appeal).

Indeed, Hartford Life does not dispute that Hughes would have had the right to access the Schiff report if Hartford Life had decided to enlist Dr. Schiff (as it did Dr. Jares) in the first instance during the initial claim decision process rather than on appeal. Why must the plan be "fair" to claimants on initial review of a claim but need not be "fair" to claimants on appeal? To the contrary, "the requirement for a full and fair review continues beyond the initial

determination into the appeal." *Solomon v. Metro. Life Ins. Co.*, 628 F. Supp. 2d 519, 532 (S.D.N.Y. 2009) (collecting cases).

It is well worth noting Hartford Life's end goal here: that Hughes *never* have an opportunity to submit any kind of factual or expert rebuttal to the report of Dr. Schiff. After all, although Hartford Life has now disclosed Dr. Schiff's report (and in turn relies heavily on its conclusions in its briefing before me, *see* Doc. # 39-1 at 16-18), Hartford Life also takes the position that the administrative record is now closed, that its medical-based judgment is entitled to the benefit of deferential abuse-of-discretion review, and that I should ignore the many affidavits that Hughes now proffers to respond to Dr. Schiff's report. Doc. #54 at 1. This is not full and fair review.

The Second Circuit has yet to address whether a plan may solicit and rely on an expert medical report during the appeal phase of an ERISA claim review while also denying a claimant's request for access to the report and an opportunity to respond to the report before the appeal is decided. In *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), the Eighth Circuit rightly rejected this "gamesmanship" tactic as fundamentally inconsistent with the notion of full and fair review:

> The process used by the Plan was not consistent with a full and fair review. Abram was not provided access to the second report by Dr. Gedan that served as the basis for the Plan's denial of benefits until after the Plan's decision. Without knowing what "inconsistencies" the Plan was attempting to resolve or having access to the report the Plan relied on, Abram could not meaningfully participate in the appeals process. Dr. Gedan's report was solicited after the deadline for an appeals decision had passed, and was sent to Abram only after the Plan issued its final denial decision. This type of "gamesmanship" is inconsistent with full and fair review. There can hardly be a meaningful dialogue between the claimant and the Plan administrators if evidence is revealed only after a final decision. A claimant is caught off guard when new information used by the appeals committee emerges only with the final denial. Abram should have been permitted to review and respond to the report by Dr. Gedan.

*Id.* at 886 (internal citations omitted).

More recently, the Ninth Circuit has ruled that a plan denied a full and fair review when it procured two consultant medical opinions but failed to disclose them to a claimant before denying his appeal. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011). "Had the plan met its duty of providing copies of its physicians' evaluations, then [claimant's] treating physicians could have provided such comments and performed such additional examinations and tests as might be appropriate[,]" but "[b]y denying [claimant] the disclosure and fair opportunity for comment, the plan denied him the statutory obligation of a fair review procedure." *Ibid*.[4]

It is true that several federal appeals courts have ruled to the contrary. The major rulings come from Eighth, Tenth, and Eleventh Circuits. *See Midgett v. Wash. Group Int'l Long Term Disability Plan,* 561 F.3d 887 (8th Cir. 2009); *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241 (11th Cir. 2008); *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161 (10th Cir. 2007).[5] In my view, their interpretation of the regulation is not convincing for several reasons I will now discuss.

To begin with, these cases to a varying degree rely on the same types of arguments that Hartford Life makes in favor of highly restrictive interpretations of the terms "relevant" and "benefit determination" as they appear in the regulation. *See, e.g., Midgett*, 561 F.3d at 894, 895

---

[4] The facts in *Salomaa* suggest that the medical reports may have been solicited and obtained by the plan during the initial claim determination phase and not disclosed to the claimant at that time or during the later appeal. *See* 642 F.3d at 670.

[5] Other federal courts of appeals have followed these decisions or otherwise cited them with approval but with little discussion or additional analysis. *See Killen v. Reliance Standard Life Ins. Co.*, 776 F.3d 303, 310-11 (5th Cir. 2015); *Morningred v. Delta Family-Care & Survivorship Plan*, 526 Fed. App'x 217, 221 n.9 (3d Cir. 2013); *Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 436-37 (D.C. Cir. 2011); *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 502-03 (6th Cir. 2010). In *Midgett*, the Eighth Circuit distinguished its prior decision in *Abram* on the ground that it involved a predecessor version of the regulation that required the disclosure of "pertinent" documents rather than "relevant" documents. *See* 561 F.3d at 894. The distinction is unconvincing in light of the fact that *Abram* reached its conclusion on the basis of its understanding of the meaning of "full and fair" review (a term that has remained constant in the regulations), rather than on technical parsing of the meaning of what constitutes a "pertinent" document under the predecessor version of the regulation.

(stating that "[t]he 'adverse benefit determination' referred to throughout § 2560.503-1(h) is the plan administrator's initial denial of a claim for benefits," and citing the definition of "relevant" materials under § 2560.503-1(m)(8)). I have addressed these arguments already and will not repeat my analysis here.

The Eleventh Circuit in *Glazer* has misinterpreted the regulation's definition of what documents are "relevant" for purposes of pending-appeal disclosure. Reciting the past-tense phrasing of the definition of what constitutes a "relevant" document (that "[a] document is relevant if it '[w]as relied upon' or '[w]as submitted, considered, or generated in the course of making the benefit determination,'" § 2560.503-1(m)(8)), the Eleventh Circuit concluded that a claimant's argument for the right to a plan-generated medical report during the pendency of the appeal was "contrary to the plain text of the regulations," because the plan "had not 'relied upon' the Hauptman [medical] report or used the report 'in the course of making the benefit determination' until the determination had been made." *Glazer*, 524 F.3d at 1245.

This interpretation is itself contrary to the plain text of the regulation. The regulation by its terms extends to any document that "*was . . . generated* in the course of making the benefit determination." § 2560.503-1(m)(8)(ii). The regulation says nothing about when the document was "used" (as the Eleventh Circuit would have it), but when the document was "generated." Nor does this provision of the regulation refer to a "completed" benefit determination but to "the course of making the benefit determination." Dr. Schiff's report was generated in the course of Hartford Life's making a benefit determination on Hughes's claim. That's the only reason why Hartford Life hired him to prepare a report. It was within the plain scope of a "relevant" document for which there was a duty to disclose upon request.

The Eleventh Circuit in *Glazer* also reasoned that its restrictive definition of the *pending-appeal* disclosure provision is necessary in order to avoid rendering "superfluous" the regulation's *post-appeal* disclosure provision. *See* 524 F.3d at 1245. But this is not so, because both the pending-appeal and post-appeal disclosure provisions serve different purposes. The pending-appeal provision allows a claimant upon request to access documents during the appeal. *See* § 2560.503-1(h)(2)(iii). The post-appeal provision allows a request only after the appeal is decided, being expressly conditioned on there having already occurred "an adverse benefit determination on review." § 2560.503-1(i)(5). These provisions serve different purposes, because they allow claimants the option to request disclosure at different stages in the process. To the extent that these provisions have some overlap, that is because—as I have discussed above—the drafters of the regulation intentionally decided to incorporate by reference the identical definition of what constitutes a "relevant" document within the scope of the disclosure duty.

The contrary circuit court decisions also rely on commentary by the Department of Labor when it issued the regulation. Noting that it had now defined the scope of what documents are "relevant" for disclosure purposes, the Department of Labor stated that it "believes that this specification of the scope of the required disclosure of 'relevant' documents [under § 2560.503-1(m)(8)] will serve the interests of both claimants and plans by providing clarity as to plans' disclosure obligations, *while providing claimants with adequate access to the information necessary to determine whether to pursue further appeal.*'" Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70,246, 70,252 (Nov. 21, 2000) (emphasis added). Some courts have seized upon this snippet from scores of pages in the regulatory commentary to suggest that the Department of Labor envisioned a scope of delayed disclosure that would only help a claimant to

fight the next round of appeals, rather than to prevail in the present appeal that has not yet been decided. *See Midgett*, 561 F.3d at 896; *Metzger*, 476 F.3d at 1167; *Glazer*, 524 F.3d at 1246.

That interpretation is hard to square with a regulation that is aimed at ensuring a full and fair review *today*, not just tomorrow. Nor is there reason to suppose that the Department of Labor had only one goal (preparing solely for future appeals) with respect to the regulation's disclosure obligation.

In any event, if the Department of Labor's commentary is important to understanding the intended scope of the regulation, then courts should also consider the Department of Labor's summary of the regulation's purpose in the first paragraph of the commentary: "to improve access to information on which a benefit determination *is* made." 65 Fed. Reg. at 70,246 (emphasis added). The Department of Labor went on to explain how "[f]uller information and fuller and fairer claims appeals processes will promote enrollee confidence and discourage workers from inappropriately discounting the value of their disability benefits, thereby fostering efficiency in disability insurance and labor markets." *Id.* at 70261.

I do not see how sandbagging claimants with last-minute medical reports that they cannot respond to does anything to inspire enrollee confidence or to serve the Department of Labor's stated regulatory purpose to ensure a full and fair review. *See Halo*, 819 F.3d at 52 (instructing courts when interpreting § 2560.503-1 "to examine the regulation's text in light of its purpose, as stated in the regulation's preamble, as well as the purpose of the regulation's authorizing statute, ERISA") (internal citations omitted).

Some courts worry that to allow claimants the right to see and respond to medical opinions that the plan generates during the appeal access "would set up an unnecessary cycle of submission, review, re-submission, and re-review." *Metzger*, 476 F.3d at 1166; *see also Midgett*,

561 F.3d at 895 (same); *Glazer*, 524 F.3d at 1246 (same). This is really a policy concern, not a

legal argument. And it glides over the fact that, after a plan discloses a newly generated medical

opinion to the claimant and after the claimant responds, the plan is free to decide *not* to consult

with yet another medical expert. Put differently, the plan may stop the "cycle" from spinning and

simply reach a determination on the basis of all the information it already has. *See Mead v.

ReliaStar Life Ins. Co.,* 2008 WL 850678, at *10 (D. Vt. 2008) (stating same reasons to critique

the "endless cycle" policy rationale), *report and recommendation adopted in part on other

grounds*, 2008 WL 850675, at *6 (D. Vt. 2008).

Nor is there any basis to conclude that disclosure during the appeal would result in time

delays that would violate the regulation's time-processing requirements. The regulation contains

ample provisions that allow for an extension of time as needed for the plan to give full and fair

consideration to a claim. *See Metzger*, 476 F.3d at 1167 n.2 (describing allowances); § 2560.503-

1(i).

One court notes that a part of the regulation requires a plan to consult with a health care

professional if its decision on appeal will be based on a medical judgment and declares that

"[c]onspicuously absent from [this consultation requirement] is any requirement that the clamant

be given the opportunity to review and rebut the health care professional's conclusion." *Midgett*,

561 F.3d at 895 (citing § 2560.503-1(h)(3)(iii)). But this absence is not conspicuous, because the

cited provision is a *consultation* requirement, not a *disclosure* requirement. The regulation

elsewhere conspicuously requires disclosure in very broad terms to require timely access for a

claimant to any of the plan's documents that are relevant to the claim and to allow this access

and a response before the plan decides to deny an appeal of the claim. *See* § 2560.503-

1(h)(2)(iii).

It is telling that the Tenth Circuit in *Metzger* declined to recognize a categorical right of a plan to withhold from a claimant newly procured medical opinion evidence before it denies the appeal of a claim. *Metzger* limited itself to allowing a plan to conceal its medical opinion reports "[s]o long as appeal-level reports analyze evidence already known to the claimant and contain no new factual information or novel diagnoses." 476 F.3d at 1167. But in the face of a regulation that already defines "relevant" documents that a plan must disclose (using a definition far broader than only documents containing "new factual information" or "novel diagnoses"), *Metzger* does nothing to explain any textual basis for its suggested limitation or for its conclusion that sometimes the plan can hide late-generated medical reports from the claimant and sometimes it cannot. I prefer to interpret and follow the regulation as written.

All in all, I am not persuaded by any of the contrary court decisions that deny the right of a claimant to see and respond to medical reports or other new evidence that a plan generates on appeal. And if there were any doubt about what a full and fair review requires in this case, it is put to rest by the Department of Labor's longstanding position "that claimants have a right to review and respond to new evidence or rationales developed by the plan during the pendency of the appeal and have the opportunity to fully and fairly present his or her case at the administrative appeal level, as opposed merely to having a right to review such information on request only after the claim has already been denied on appeal." Claims Procedure for Plans Providing Disability Benefits, 81 Fed. Reg. 92,316, 2016 WL 7326455 (Dec. 19, 2016); *see also* Brief of the Secretary of Labor, Hilda L. Solis, As *Amicus Curiae* in Support of Plaintiff-Appellant's Petition for Rehearing, *Midgett v. Washington Grp. Int'l Long Term Disability Plan*, No. 08-2523 (8th Cir. June 3, 2009), 2009 WL 8186025, at *5, *14 (arguing that ERISA "claimants are deprived of a full and fair review when claimants are prevented from responding

at the administrative level to evidence developed by the plan" during the course of an administrative appeal and invoking *Auer* deference to the department's position).

Under the rule of *Auer* deference, a court must defer to an agency's interpretation of its own regulation if the regulation is ambiguous and if the agency's interpretation is not plainly erroneous or inconsistent with the regulation. *See Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000); *Auer v. Robbins*, 519 U.S. 452, 461 (1997). The Second Circuit has recently applied *Auer* deference to interpret a different provision of the same regulation—29 C.F.R. § 2560.503-1—that is at issue in this case. *See Halo*, 819 F.3d at 54. Therefore, even assuming that the regulation were ambiguous (which it is not) with respect to a plan's duty upon request to disclose medical expert opinions that it obtains during the appeal phase of a claim determination and with respect to its duty to afford the claimant an opportunity to respond before the plan denies the claim on appeal, I would be required to follow the Department of Labor's interpretation because it is neither a plainly erroneous interpretation of the regulation nor inconsistent with the principle of full and fair review that the regulation is designed to protect.

Despite the Department of Labor's *amicus* brief in support of a petition for rehearing *en banc* by the Eighth Circuit in *Midgett*, the Eighth Circuit denied rehearing *en banc* without comment. It does not appear that any court since then has acknowledged the Department of Labor's *amicus* brief and its argument for *Auer* deference (despite its availability on Westlaw). If so, there is no merit to Hartford Life's argument that "the Court should not defer to an 'interpretation' by the Department of Labor that numerous Courts of Appeal have rejected," Doc. #71 at 2, because those courts of appeals have declined to date even to acknowledge the Department of Labor's position.

Similarly, Hartford Life notes that the Supreme Court has granted certiorari to reconsider the doctrine of *Auer* deference. *See Kisor v. Wilkie*, No. 18-15 (to be argued Mar. 27, 2019). Although Hartford Life urges that doubt about "the continued vitality of *Auer* deference strongly counsels against expanding its reach in this case," Doc. #71 at 2, the reality is that *Auer* remains the law of the land for now and which I am obliged to follow. In any event, as I have made clear, I do not view the regulation as ambiguous in the first place and would reach the same conclusion in this case regardless whether *Auer* survives.

To be sure, the Department of Labor has also recently amended the regulation to explicitly set forth the plan's duty to disclose new evidence on appeal. *See* 29 C.F.R. § 2560.503-1(h)(4)(i) (2018). But the Department of Labor has explained that it did so in order to make explicit its prior interpretation of the rule and to correct the errant court rulings that misconstrued it. *See* Claims Procedure for Plans Providing Disability Benefits, 81 Fed. Reg. 92,316 at *92,324 & n.17, 2016 WL 7326455 (Dec. 19, 2016) (citing *Metzger*, *Glazer,* and *Midgett*, *supra*). Therefore, I can draw no conclusion in Hartford Life's favor from the fact that the Department of Labor has chosen to amend the regulation to make even more explicit a plan's duty of full and fair review.

In short, I conclude that Hartford Life did not provide a full and fair review of Hughes's claim. I also conclude that its failure was neither inadvertent nor harmless in view of the extensive reliance that Hartford Life placed on Dr. Schiff's report in its decision on Hughes's claim. Accordingly, Hughes's claim is subject to *de novo* review.

Did Hughes's condition in fact improve between 2012 and 2016 such that she was no longer entitled to disability benefits? Under *de novo* review I could, of course, try to decide this question myself in light of the entire record as well as the supplemental exhibits that Hughes has

now offered to rebut Dr. Schiff's report. But I think the best course of action is to remand the case to Hartford Life for a speedy full and fair reconsideration. *See Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 490 (2d Cir. 2013); *Benjamin v. Oxford Health Ins., Inc.*, 2018 WL 3489588 at *11 (D. Conn. 2018) (finding that "remand to the plan administrator, for full and fair evaluation of the claims, in the first instance, is the appropriate remedy").

As the Second Circuit has noted, "[a] benefit determination is a fiduciary act, and [the plan administrator] owes plan beneficiaries a special duty of loyalty" that includes "interpret[ing] and apply[ing] plan terms 'solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries.'" *Miles*, 720 F.3d at 490 (quoting 29 U.S.C. § 1104(a)(1)(A)(i)). "While this fiduciary obligation does not necessarily favor payment over nonpayment," Hartford Life "is reminded that it may not adopt an adversarial approach toward [Hughes] in the benefits determination." *Ibid.* (internal quotation marks and citation omitted). Because I am remanding this case for failure to provide full and fair review, I need not consider Hughes's remaining arguments, all of which should be considered in good faith by Hartford Life on remand.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (Doc. #41) is GRANTED insofar as the case is remanded to defendant for a full and fair review of plaintiff's claim. Defendant's motion for summary judgment (Doc. #39) is DENIED. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 25th day of March 2019.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge